[Cite as *State v. Kersbergen*, 2015-Ohio-3103.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.   CA2014-10-218 |
| - vs - | : | O P I N I O N<br>8/3/2015 |
| | : | |
| JAMES KERSBERGEN, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2014-05-0809



Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Fl., Hamilton, Ohio 45011, for plaintiff-appellee

Neal D. Schuett, 121 West High Street, Oxford, Ohio 45056, for defendant-appellant



**PIPER, P.J.**

{¶ 1}   Defendant-appellant, James Kersbergen, appeals his convictions and sentence in the Butler County Court of Common Pleas for multiple counts of rape and gross sexual imposition.

{¶ 2}   In September 2013, four children decided to make a time capsule.  They gathered various items from their homes, and wrote their deepest secrets on individual pieces of paper.  The individual secrets were taped shut, and placed in the capsule.  The

children could not bury the capsule because it became too dark, and one of the children, D.T., took the capsule home. D.T. opened the capsule and read the secret of R.C. Her secret read, "I am [R.C.] and my deapest [sic] secret is; I am not a virgin because I got raped at 9 yrs old by James Kirshbergin [sic]."

{¶ 3} D.T.'s reading of R.C.'s note caused him distress, and his school work began to suffer. D.T. eventually told his teacher about R.C.'s note. D.T. also attempted to talk with R.C. about it. When D.T. discussed the note with R.C., she acted "very skittish" and seemed "afraid" to discuss it. R.C. told D.T. that she did not "want to talk about it" and avoided the subject.

{¶ 4} Eventually, D.T.'s grandmother spoke to R.C. about the note, and R.C. confided in the grandmother that Kersbergen, who had been her mother's boyfriend, had sexually abused her when she was younger. D.T.'s family called police, and the police responded to the grandmother's house while R.C. was there.

{¶ 5} The police investigation revealed that Kersbergen had been in a relationship with R.C.'s mother and had lived in the home with R.C., her siblings, and her mother for three years while R.C. was in elementary school. Kersbergen had acted as a father figure to R.C. and her siblings. As such, Kersbergen remained in the children's lives after the termination of his relationship with R.C.'s mother.

{¶ 6} R.C. and her siblings would visit Kersbergen, often for overnight weekend visits. Usually, R.C. would visit Kersbergen with her sister, S.C., and other times she would visit with her other two siblings. During one overnight visit, R.C. slept in Kersbergen's bed because she had experienced a nightmare. While in bed with Kersbergen, he pulled her toward him and digitally penetrated the child. Despite her telling him to stop, Kersbergen continued to put his hands on the inner and outer portion of the child's vagina and only stopped when she began crying because it was painful. Kersbergen then told the child that he was sorry and

tried to explain that he touched her because he "hadn't had a girl in a long time." Kersbergen also told R.C. that she could not tell anyone or "something bad would happen."

{¶ 7} Kersbergen's sexual abuse continued during consecutive visits, including digital penetration and pulling the child's shirt up and touching her breasts. On the third consecutive visit, R.C. told Kersbergen that if he continued to touch her, she would tell her mother. Kersbergen told R.C. that if she did tell, something "bad" would happen to her mother.

{¶ 8} The investigation also revealed that Kersbergen sexually abused R.C.'s sister during an overnight visit. S.C., who is one year older than R.C., told police that Kersbergen rubbed her breast under her clothing with his hand, and that she escaped the room when she heard him pull down his pants.

{¶ 9} The children were taken to the Mayerson Center at Cincinnati Children's Hospital where they were interviewed. R.C. was interviewed by Andrea Powers, and during the interview, R.C. shared concerns that she was developing differently than other girls and experiencing cramps. R.C. asked Powers whether or not the things she was experiencing could be attributed to the sexual abuse.

{¶ 10} Kersbergen was indicted on three counts of rape and one count of gross sexual imposition, and he pled not guilty to the charges. A jury trial occurred, at which D.T., D.T.'s grandmother, R.C., S.C., the children's mother, and Powers testified on behalf of the state. Kersbergen testified in his own defense.

{¶ 11} The jury found Kersbergen guilty of two counts of rape and the one count of gross sexual imposition, but could not reach a verdict as to a third rape charge. Kersbergen was sentenced to an aggregate sentence of life in prison without parole eligibility. Kersbergen now appeals his conviction and sentence, raising the following assignments of error. For ease of discussion, we will address some of Kersbergen's assignments of error together, and out of order.

{¶ 12} Assignment of Error No. 5:

{¶ 13} DEFENDANT-APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 14} Kersbergen argues in his fifth assignment of error that his convictions are against the manifest weight of the evidence.

{¶ 15} A manifest weight challenge examines the inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other. *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298. When determining whether a conviction is against the manifest weight of the evidence, the court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Cummings*, 12th Dist. Butler No. CA2006-09-224, 2007-Ohio-4970, ¶ 12.

{¶ 16} While appellate review includes the responsibility to consider the credibility of witnesses and the weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 17} Kersbergen was convicted of two counts of rape in violation of R.C. 2907.02(A)(1)(b), which prohibits engaging in sexual conduct with another, who is not the spouse of the offender, when the other person is less than 13 years of age, whether or not

the offender knows the age of the other person. Kersbergen was also convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4), which prohibits sexual contact with a child under 13. After reviewing the record, we find that Kersbergen's convictions were not rendered against the manifest weight of the evidence.

{¶ 18} D.T. testified first and explained the circumstances surrounding the making of the time capsule. He testified that when he and R.C. were in the seventh grade, they and two other friends decided to make a time capsule. They took a shoe box and filled it with "random objects" such as pennies, and also decided to put their "deepest secrets" on separate pieces of paper. They each wrote their secrets, taped the paper shut, and placed the papers in the box, agreeing to bury it and dig it up in ten years. The children were unable to bury the box because it was too dark, and D.T. took the box home and placed it in his basement.

{¶ 19} D.T. testified that he opened R.C.'s secret, and upon seeing the note, he made a plan to "track down" Kersbergen and make him apologize to R.C. D.T., disturbed by R.C.'s secret, became distracted from his school work. D.T. told his teacher about R.C.'s secret, and apologized for his school work suffering. The school then contacted D.T.'s family, and they talked to him about the note.

{¶ 20} D.T. also talked to R.C. about the note. He testified that when he would ask her about it, she would act "very skittish and afraid to talk about it." D.T. testified that R.C. would tell him that she did not want to talk about the note and walk away from him when he tried to broach the subject. D.T. testified that he spoke to his grandmother about R.C.'s secret and that R.C. became angry and distant from him after his family called the police.

{¶ 21} D.T.'s grandmother testified, and confirmed that D.T. talked to her about the note. She also testified that D.T.'s behavior had changed and that his teachers were calling the family because of his uncharacteristic behavior. D.T.'s grandmother testified that the

same day she received a phone call from D.T.'s teachers regarding D.T.'s desire for revenge upon Kersbergen, R.C. came to her house upset and crying. D.T.'s grandmother testified that R.C. confided in her about the abuse. D.T.'s grandmother testified that she, herself, became upset because no one, including R.C.'s mother, was doing anything about the abuse perpetrated upon R.C., and she decided to call police. Police came to the grandmother's house and spoke to R.C., thus beginning their investigation.

{¶ 22} R.C. testified next, and stated that her mother and Kersbergen had dated for approximately three years, Kersbergen lived with them, and that Kersbergen had been a father figure to her and her siblings. She testified that once Kersbergen and her mother ended their relationship, she and her siblings would visit Kersbergen on weekends. R.C. testified that when she would visit Kersbergen, she would often sleep in his bed because she had nightmares.

{¶ 23} R.C. testified that on one such overnight visit, she was sleeping in Kersbergen's bed and awoke when she felt him "tugging" her to the middle of the bed. Kersbergen pulled down R.C.'s panties and touched both the inside and outside of her vagina. R.C. testified that Kersbergen's touching hurt her, and that she tried to stop him to no avail. R.C. testified that she continued to move her entire body in an attempt to avoid his touching, and that he finally stopped once she started crying in pain. Kersbergen then apologized, and told R.C. that he "hadn't had a girl in a long time." Kersbergen also told R.C. that if she told anyone of what occurred, something "bad would happen." R.C. testified that after Kersbergen warned her, she turned over and cried herself to sleep.

{¶ 24} R.C. testified that the touching continued on future visits, including the next weekend she went to Kersbergen's house. R.C. testified that Kersbergen tugged on her again, as before, and that he pulled down her pants and panties, and pulled up her shirt. Kersbergen inserted his fingers into R.C.'s vagina, and she testified that the touching was

painful. R.C. also testified that when the touching occurred the next time, in the same manner as before, she told Kersbergen that she as going to tell her mother about the touching. Kersbergen told her that if she did tell, something "bad" would happen to her mother. R.C. also testified that when Kersbergen continued to touch her, she yelled for her sibling, and he then covered her mouth to quiet her. After that night, R.C. did not visit with Kersbergen anymore.

{¶ 25} S.C., R.C.'s older sister, also testified that Kersbergen touched her during an overnight visit with him. S.C. testified that on one occasion, she slept in Kersbergen's bed and that she woke to him touching her left breast under her clothing. S.C. testified that she felt Kersbergen rubbing his thumb over her breast, and "repeatedly rubbing" her nipple. S.C. got out of the bed when she heard Kersbergen pulling down his pants, and she told Kersbergen that she felt sick and left the room.

{¶ 26} S.C. and R.C.'s mother testified next, and stated that she learned that Kersbergen had touched her daughters when they spoke to her about it. The mother testified that her daughters would not disclose specific details, and that she did not call police because her daughters did not want her to.

{¶ 27} Andrea Powers, a social worker and forensic interviewer at the Mayerson Center, testified that she interviewed R.C. in order to assess the child's "physical, emotion, [sic] medical health." Powers testified that she asked R.C. if she had any concerns about her body, and that R.C. told her that she was concerned that she was developing differently than other girls and experienced cramps. When Powers asked R.C. whether her concerns were general, R.C. told her that her concerns were related to Kersbergen's abuse.

{¶ 28} As previously stated, Kersbergern testified in his own defense. When asked whether he touched R.C. or S.C. in the manner in which they had described, Kersbergen answered "never." He also testified that the reason the visits stopped was because he lost

his job and moved to live with his best friend's mother. However, on cross-examination, the state showed Kersbergen utility bills that were still in his name at the time he claimed he had moved from the house, and around the same time that R.C. and S.C. stopped visiting him.

{¶ 29} The jury returned guilty verdicts on two of the rape charges, as well as the gross sexual imposition charge. The jury was not able to reach a verdict on the third rape count. The jury's deliberations and decision show that the jury considered the weight of the evidence, as well as the credibility of the witnesses, including Kersbergen's own credibility while testifying, and found that the greater weight of evidence supported guilty findings. "Upon acknowledging that such extensive testimony will inevitably produce some inconsistent or conflicting assertions, we recognize the sound principal that the trier of fact is best positioned to weigh the credibility of the individual witness and reach a conclusion based on the totality of the evidence." *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 41, quoting *State v. Dunn*, 9th Dist. Lorain No. 04CA00854A, 2005-Ohio-1270, ¶ 10.

{¶ 30} After reviewing the record, we find that the jury did not clearly lose its way or create such a manifest miscarriage of justice that a new trial must be ordered. As such Kersbergen's convictions were not against the manifest weight of the evidence, and his fifth assignment of error is overruled.

{¶ 31} Assignment of Error No. 1:

{¶ 32} THE DEFENDANT-APPELLANT'S RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE TRIAL COURT LET THE JURY CONSIDER EVIDENCE THAT WAS OUTSIDE THE RECORD.

{¶ 33} Assignment of Error No. 2:

{¶ 34} DEFENDANT-APPELLANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

{¶ 35} Assignment of Error No. 6:

{¶ 36} DEFENDANT-APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED WHEN HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 37} Kersbergen argues in his first, second, and sixth assignments of error that he received ineffective assistance of counsel and an unfair trial because the jury was permitted to consider the time capsule note even though it was never admitted into evidence.

{¶ 38} The United States Supreme Court established a two-part test in regard to ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). That test requires an appellant to establish that first, "his trial counsel's performance was deficient; and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial." *State v. Myers*, 12th Dist. Fayette No. CA2005-12-035, 2007-Ohio-915, ¶ 33, citing *Strickland.* Regarding the first prong, an appellant must show that his counsel's representation "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688. The second prong requires the appellant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 39} Kersbergen claims that his counsel was ineffective because the court allowed the jury to consider the time capsule note written by R.C. without formally admitting it into evidence. The admissibility of relevant evidence is left to the sound discretion of the trial court. *State v. Atkinson*, 12th Dist. Warren No. CA2009-10-129, 2010-Ohio-2825, ¶ 7. "Absent an abuse of discretion, as well as a showing that appellant suffered material prejudice, an appellate court will not disturb a trial court's ruling as to the admissibility of evidence." *Id.* An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *State v. Ford*, 12th

Dist. Butler No. CA2009-01-039, 2009-Ohio-6046, ¶ 36.

{¶ 40} As previously referenced, no objection was raised at trial challenging the note's admission into evidence. As such, we will employ a plain error standard when reviewing this issue. Plain error exists where there is an obvious deviation from a legal rule which affected the defendant's substantial rights, or influenced the outcome of the proceeding. *State v. Horna*, 12th Dist. Butler No. CA2013-11-210, 2015-Ohio-1697, ¶ 14. Notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Grisham*, 12th Dist. Warren No. CA2013-12-118, 2014-Ohio-3558, ¶ 38. Therefore, an appellate court will not reverse the trial court's decision unless the outcome of trial would have been different but for the alleged error. *State v. Dougherty*, 12th Dist. Preble No. CA2013-12-014, 2014-Ohio-4760, ¶ 53.

{¶ 41} Kersbergen correctly points out that the state never expressly articulated a motion for the admission of the time capsule note. Instead, during D.T.'s testimony, the state moved the court to "publish" the note to the jury. The trial court asked defense counsel if there were any objections to the note being published, and none were raised. The state then placed the note on an overhead projector so that the jury was able to see the hand-written note in which R.C. stated her deepest secret regarding the sexual abuse.

{¶ 42} While there is no set rule of law that definitely establishes that a piece of evidence must be admitted prior to it being published to the jury, several courts require in practice the admission of evidence before publication to the jury.[1] For that reason, we assume that the court and both parties moved forward under the impression that the publication of the evidence implicitly included its admission, even absent a formal motion by

---

1. "Assuming the judge rules that the exhibit will be accepted in evidence, if it is a writing, it may be read to the jury by the counsel offering it or by the witness. With the judge's permission, the writing could also be passed to the jury or displayed on a screen." McCormick, *Evidence*, Section 51, at 247 (6th Ed.Thomson West Ed.2006).

the state to admit the note.[2]

{¶ 43} In fact, the trial court specifically expressed its understanding that the note had been previously admitted into evidence. On the second day of trial, and after the state moved on the first day to publish the note, the parties and trial court began discussing exhibits. The court then stated, "2 through 11 have already been admitted. Those are the photographs. I admitted the letter into evidence already." The trial court's statement that it had admitted the letter was specific to R.C.'s note in which she shared her deepest secret, the same note that was published to the jury the day before.

{¶ 44} This express statement clearly indicates that the trial court admitted the note into evidence, even if such admission was effectuated sua sponte. Despite Kersbergen's contrary argument, a trial court has the discretion to admit or exclude evidence absent a formal request from the state. *State v. Marker*, 2d Dist. Greene No. 2014-CA-1, 2014-Ohio-3840, ¶ 27; *State v. Chandathany*, 9th Dist. Medina No. 02CA0081-M, 2003-Ohio-1593; and *Neal v. Hamilton County et al.*, 87 Ohio App.3d 670 (1st Dist.1993).

{¶ 45} Moreover, we also note that the state made an additional request to the court that all of its exhibits be admitted before it rested. The state began to rest its case on the second day of trial, and stated to the court, "with that *and the submission of the State's Exhibits*, the State is prepared to rest." (Emphasis added.) This statement was never objected to by the defense, and the trial court permitted the state's exhibits to be admitted, including the time capsule note.

{¶ 46} Additionally, and even if the evidence was not properly admitted for the above-

---

2. The transcript of proceedings supports our assumption, as both parties continued to reference the note throughout trial and during closing arguments as if it had been admitted. For example, during the state's closing argument, the prosecutor stated, "His Honor will tell you that evidence are the exhibits that were admitted in trial -- so the photographs, *[R.C,]'s notes*, the utility bills—and that evidence also includes testimony from this witness stand." (Emphasis added.)

- 11 -

noted reasons, we also find the jury's ability to consider the note during deliberations did not amount to plain error because Kersbergen has failed to establish that the outcome of his trial would have been different if the jury had not reviewed the note.

{¶ 47} The trial started with the state fully explaining the note, and how it began a chain reaction leading to the investigation and arrest of Kersbergen. Both the state and defense counsel referenced the note multiple times in their arguments, and also while examining and cross-examining the witnesses. D.T. testified at length about the note, as did R.C., on both direct and cross-examination. The actual note, therefore, was cumulative to all of the testimony already offered.[3] Because the contents of the note had already been established through the testimony of more than one witness, and continually referenced by both parties, there is no indication that Kersbergen's guilty verdicts would have been different had the jury not been given the note.

{¶ 48} This is especially true where the record indicates that Kersbergen's convictions were not based solely upon the note being considered by the jury. While the note explained why police began their investigation resulting in criminal charges against Kersbergen, the note did not establish Kersbergen's guilt, as the jury was unable to reach a verdict on one of the rape counts. The record clearly establishes that the jury relied upon the witnesses' testimony regarding the various instances of rape and gross sexual imposition, and did not predicate its verdicts solely upon the note's existence.

{¶ 49} The note contains one sentence, the contents of which are straightforward. Its contents were fully explained, testified to, and discussed even before it was published to the

_____

3. Kersbergen argues that because the state never formally requested the note be admitted, his counsel never had the opportunity to object. The record reveals otherwise. As already stated, and as will be further discussed, the note was mentioned indirectly and directly, was published, was referenced as being admitted, and was the subject of testimony multiple times. At no time did defense counsel object. Instead, defense counsel used the note in the development of his arguments and cross-examination of witnesses. As such, defense counsel was never denied the opportunity to object to the note's admission or use.

jury. Furthermore, the parties continued to use the note for different purposes throughout trial and during closing arguments. As such, the trial court's decision to allow the note to be published to the jury and to allow the note's admission as evidence reviewable by the jury during its deliberations was not error—plain or otherwise.

{¶ 50} Kersbergen also claims that even if the evidence had been admitted, it should not have been because it was inadmissible hearsay. Hearsay is an out-of-court statement, offered to prove the truth of the matter asserted, and must be excluded unless some exception exists. Evid.R. 801(C); Evid.R. 802. However, where, as here, the evidence is offered to show the effect on the listener rather than to prove the truth of the matter asserted, the out of court statement is nonhearsay.[4] *State v. Simms*, 12th Dist. Butler No. CA91-09-161, 1992 WL 168918, *1 (July 20, 1992). The state offered the note to show how the investigation began, as well as how D.T. was affected by the note enough that his family became involved in the situation and eventually called police. As such, the note did not constitute hearsay, and was properly admitted.

{¶ 51} For the foregoing reasons, there is also no merit to Kersbergen's argument that his trial counsel was ineffective for not objecting to the fact that the state did not technically move for the admission of the note as evidence. Nor is there any merit to Kersbergen's argument that the prosecutor committed misconduct by referencing the note and its contents, and using the note in its case-in-chief. Kersbergen's first, second, and sixth assignments of error are therefore overruled.

{¶ 52} Assignment of Error No. 3:

{¶ 53} DEFENDANT-APPELLANT'S SUBSTANTIVE RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE SUA SPONTE OBJECTIONS AND ADMISSION OF EVIDENCE BY

---

4. Obviously, the jury did not consider the note as proof that Kersbergen raped R.C., as it did not reach a guilty verdict on one of the counts.

THE COURT.

{¶ 54} Kersbergen argues in his third assignment of error that the trial court erred in sua sponte raising objections to the way in which defense counsel cross-examined R.C.[5]

{¶ 55} As already addressed, the trial court's decision regarding the admission of evidence will not be disturbed absent an abuse of discretion and a showing that appellant suffered material prejudice. *State v. Atkinson*, 12th Dist. Warren No. CA2009-10-129, 2010-Ohio-2825.

{¶ 56} Kersbergen argues that several times during R.C.'s cross-examination, the trial court stopped defense counsel from questioning the child about inconsistent statements the child made during her interview at the Mayerson Center compared to the child's testimony. Kersbergen argues that the trial court's interference with cross-examination amounted to sua sponte objections from the trial court, and prejudiced him because defense counsel could not challenge the child's credibility.

{¶ 57} Despite Kersbergen's argument, a review of the record indicates that Kersbergen was not prejudiced by the trial court's decisions and was not stopped from testing the child's credibility on cross-examination. The transcript indicates that defense counsel attempted to impeach the child's credibility on cross-examination with the use of her prior inconsistent statements made during her interview at the Mayerson Center. At one point during cross-examination, the trial court permitted the child to listen to portions of her interview in open court, but outside the presence of the jury. Listening to the interview refreshed the child's recollection of her interview, and cross-examination resumed.

{¶ 58} After listening to a portion of the taped interview, the child answered a few of

---

5. Kersbergen also argues that the trial court erred in sua sponte admitting the time capsule note into evidence. However, given our discussion and analysis of this issue within Kersbergen's other assignments of error, we need not address the issue any further.

Kersbergen's questions that she did not remember certain statements she made during her interview. Even so, and although the trial court did not permit defense counsel to play the video of the interview again, the record is clear that the jury heard evidence that some of the child's statements made at trial were different than those offered during her interview.

{¶ 59} Despite the interview not being played each time the child was asked about what she said during the interview, defense counsel was able to demonstrate that the child's statements during the interview were somewhat different than her trial testimony. For example, R.C. admitted during cross-examination that she told the social worker that Kersbergen lived in an apartment, even though at trial, R.C. was insistent that the abuse occurred in the bedroom of Kersbergan's house. R.C. also told the social worker that she could not remember anything that happened after Kersbergen touched her, whereas at trial she gave testimony about what was said and done after each instance of abuse. Therefore, the jury was able to see that there were differences between the statements made during the interview and what the child testified to at trial.

{¶ 60} Kersbergen has not identified how he was prejudiced by the trial court interruption of cross-examination, or its refusal to allow the taped interview to be played, other than to claim it denied him the ability to generally attack R.C.'s credibility.[6] However, this argument completely ignores the fact that defense counsel tested R.C.'s credibility regarding the differences between her interview statements and trial testimony. Also, the argument ignores the fact that defense counsel was successful in attacking R.C.'s credibility

---

6. The transcript does not indicate why the trial court interrupted defense counsel's questioning or denied counsel's request to play the taped interview. There are several possible reasons for the trial court's decision: including improper phraseology that it "possibly" refreshed her recollection; no written transcript of the video existed that could efficiently be shown the child to refresh her recollection; or that the child never denied that she made a prior inconsistent statement so that the video would have been improper extrinsic evidence of the prior inconsistent statement. However, Kersbergen did not ask the trial court for clarification as to why the request to play the video was denied, and he does not assert on appeal the specific way in which he was prejudiced by the court's decisions other than to suggest his general inability to challenge R.C.'s credibility.

to such a degree that the jury did not find Kersbergen guilty of a third rape charge. There is no evidence on record that the trial court's rulings during R.C.'s testimony prejudiced Kersbergen in any way. As such, Kersbergen's third assignment of error is overruled.

{¶ 61} Assignment of Error No. 4:

{¶ 62} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT ADMITTED INADMISSIBLE HEARSAY TESTIMONY.

{¶ 63} Kersbergen argues in his fourth assignment of error that the trial court erred in admitting the testimony of Andrea Powers, the social worker and forensic interviewer at the Mayerson Clinic, because it was hearsay. Kersbergen did not object to Powers' testimony at trial, thus he has waived all but plain error on appeal.

{¶ 64} As previously addressed, an appellate court will not reverse the trial court's decision on the basis of plain error unless the outcome of trial would have been different but for the alleged error. *State v. Dougherty*, 12th Dist. Preble No. CA2013-12-014, 2014-Ohio-4760, ¶ 53.

{¶ 65} Kersbergen argues first that Powers' testimony about her interview was inadmissible hearsay. Evid.R. 803(4) provides that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible in court as exceptions to the hearsay rule. "A fundamental assumption underlying the medical-treatment exception is that this particular hearsay is reliable." *State v. Wagers*, 12th Dist. Preble No. CA2009-06-018, 2010-Ohio-2311, ¶ 51. A child's statements made to a social worker regarding sexual abuse she experienced are admissible under Evid.R. 803(4) when made for the purposes of medical diagnosis or treatment. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 39.

{¶ 66} The record indicates that R.C. specifically made statements to Powers regarding her medical diagnosis and possible treatment. R.C. noted that she had concerns about her breast development, how she was developing compared to other girls her age, that she had cramps, and had not started menstruating yet. She asked Powers if her concerns could be related to having been sexually abused. As such, R.C.'s statements to Powers were for the purposes of medical diagnosis, and the trial court committed no plain error in admitting the testimony.

{¶ 67} Kersbergen also argues that permitting Powers to testify was a violation of his right to confront witnesses against him. The Ohio Supreme Court has acknowledged the dual role a social worker has when interviewing a victim of sexual abuse as having both an investigatory and medical aspect. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742. The social worker's interview must "gather forensic information to investigate and potentially prosecute a defendant for the offense" as well as "elicit information necessary for medical diagnosis and treatment of the victim." *Id.* at ¶ 33. The *Arnold* Court determined that such statements made to the social worker for the primary purpose of investigation or forensics, unrelated to an ongoing emergency, are testimonial in nature and are prohibited by the Confrontation Clause without a prior opportunity for cross-examination. *Id.* However, the court went on to state that statements made during the social worker's interview that are necessary to diagnose and medically treat a victim are nontestimonial in nature and admissible without violating the Confrontation Clause. *Id.*

{¶ 68} Based on our review, we find no plain error in allowing Powers to testify about her interview with R.C. As this court has previously recognized "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 48. Instead, the Confrontation Clause does not bar admission of a

statement "so long as the declarant is present at trial to defend or explain it." *Id.* As previously noted, R.C. testified at trial and was subject to cross-examination on the statements she had made at the Mayerson Center. Thus, any allegedly testimonial statements made by R.C. in her interview with Powers did not violate appellant's Confrontational Clause rights because R.C. was available to testify, did testify at trial, and moreover, the statements R.C. made were for the purposes of medical diagnosis as previously established. Therefore, Kersbergen's fourth assignment of error is overruled.

{¶ 69} Assignment of Error No. 7:

{¶ 70} THE CUMULATIVE EFFECT OF ERRORS DURING THE TRIAL DEPRIVED DEFENDANT-APPELLANT OF HIS RIGHT TO A FAIR TRIAL.

{¶ 71} Kersbergen argues that even if one of the errors he ascribes was not enough to warrant reversal, the collective nature of all of the asserted errors requires reversal.

{¶ 72} According to the cumulative error doctrine, a conviction will be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though each error individually does not rise to the level of prejudicial error. *State v. Hoop*, 12th Dist. Brown No. CA2011-07-015, 2012-Ohio-992, ¶ 58.

{¶ 73} Having previously found no error as set forth above, we find no cumulative error. Accordingly, Kersbergen's seventh assignment of error is overruled.

{¶ 74} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.