[Cite as *In re L.H.*, 2018-Ohio-802.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NOS. CA2017-06-081 |
| L.H., et al. | : | CA2017-06-083 |
| | | CA2017-06-087 |
| | : | |
| | | O P I N I O N |
| | : | 3/5/2018 |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 17-D000022, 17-D000023, & 17-D000024

The Law Offices of Jane A. Short, Alexandra E. Winters, 42 East Silver Street, Lebanon, Ohio 45036, guardian ad litem

Kim Bui, 8080 Beckett Center Drive, Suite 112, West Chester, Ohio 45069, for appellant, Mother

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services

**RINGLAND, J.**

{¶ 1} Mother appeals from the decisions of the Warren County Court of Common Pleas, Juvenile Division, which adjudicated her children dependent and abused and granted protective supervision to Warren County Children Services. For the reasons discussed below, we reverse.

{¶ 2} Mother is the biological mother of D.T. and his two younger step-siblings, L.H.1

and L.H.2. D.T.'s biological father is deceased. Father, who is not a party to this appeal, is believed to be the biological father of L.H.1 and L.H.2.

{¶ 3} At the adjudicatory hearing, a caseworker with Warren County Children Services ("WCCS" or "the agency") testified that in August 2016, the agency received a report alleging that Father was physically abusing D.T. – then seven years old – with a belt. The report also alleged that there were firearms in the apartment where Mother and the children lived. The caseworker contacted Mother by phone, who denied the allegations.

{¶ 4} The caseworker subsequently visited the apartment. Mother, D.T., and L.H.1 were present. L.H.2 was not yet born. Mother again denied that abuse occurred or that there were firearms in the apartment. The caseworker asked Mother about allegations that Father had committed acts of domestic violence towards her. Mother denied the allegations and claimed that her mother ("maternal grandmother") reported the allegations and that maternal grandmother did not like Father.

{¶ 5} During the visit, the caseworker had no concerns with respect to the condition of the apartment, the availability of food, or the condition of the children. Father appeared while the visit was ongoing. Father denied living with Mother and the children and claimed to reside with another person in the same apartment complex. Father denied physically abusing D.T. and denied that there were firearms in the apartment.

{¶ 6} The caseworker observed D.T.'s room and noticed that there was a plastic liner on the bed and the room smelled of urine. Mother and Father explained that D.T. had been urinating on himself and that they were seeing a pediatrician to address the issue.

{¶ 7} The caseworker offered Mother and Father parenting classes. Both declined. The caseworker noticed that L.H.1 appeared to have delayed speech issues and offered to enter the child into a speech program. Mother and Father declined this offer.

{¶ 8} The caseworker maintained sporadic contact with Mother over the next few

months. In early November 2016, the caseworker again visited with the family. All family members were present, including L.H.2 who had just recently been born. Mother and Father again reported that Father was not living at the apartment. The caseworker again offered parenting classes, which the parents declined. There were no concerns with the apartment.

{¶ 9} The caseworker testified that in January 2017 the agency received a report that D.T. was fearful to return home from school because Mother "whooped" D.T. on his "nuts" with a belt as discipline for urinating on himself and leaving his soiled clothing in the bathroom. The caseworker and another WCCS social worker went to the apartment, where Mother and Father were present. D.T. was still at school.

{¶ 10} The caseworker relayed the allegations from outside the apartment. Mother and Father both became extremely upset. Mother denied the allegations and told the caseworker that she was not going to allow her to enter the apartment. Mother complained that the agency should have closed their case. Father was walking through the apartment, yelling, and saying that "people were lying."

{¶ 11} D.T. arrived as the caseworker was attempting to convince Mother and Father to let the agency enter D.T. into a safety plan. Mother confronted D.T., asking him if he felt safe in the home, if he told anyone he did not feel safe, and whether he was being physically abused. D.T. said "no."

{¶ 12} The caseworker asked for permission to speak with D.T. privately, which the parents allowed. The caseworker spoke with D.T. for approximately seven minutes. D.T. was quiet and shy. D.T. would only answer the caseworker's questions with one or two-word answers. The caseworker asked D.T. if he was afraid of being at home and he shook his head slowly from side to side, indicating "no." The caseworker asked D.T. if he had been hurt recently and D.T. shrugged his shoulders. D.T. was in winter clothing. The caseworker could not see whether there were any bruises or marks on his body and did not check.

{¶ 13}  While the caseworker spoke with D.T., Father continued to yell in the background.  Father then went into the kitchen and the caseworker heard loud noises like "dishes hitting each other."  Given the escalation in Father's anger, the two agency employees decided to call the police.

{¶ 14}  The responding police officers went into the apartment and spoke with Mother and Father.  Father calmed down after speaking with the police.  The caseworker again asked the parents to enter D.T. into a safety plan.  They declined.

{¶ 15}  WCCS scheduled D.T. for an interview the next day at the Child Advocacy Center of Warren County ("CAC").  Maternal grandmother brought D.T. to the interview. Over Mother's objection, the social worker who conducted the interview, Tracey Tindall, testified that D.T. disclosed to her that Mother "whooped" him on his "private parts" with Father's belt.  Tindall asked D.T. how the "whooping" felt; he yelled.  D.T. also disclosed that his dad "whooped" him on his butt, although D.T. pointed towards his upper thigh.  D.T. also alleged that Father "whooped" him for "telling" and that he was "hurt on his arm."

{¶ 16}  In February 2017, WCCS filed a complaint alleging that D.T. was an abused and dependent child.  WCCS simultaneously filed complaints alleging that L.H.1 and L.H.2 were dependent children.  WCCS requested that the court grant a disposition of protective supervision to the agency.

{¶ 17}  Following the adjudicatory hearing, at which only the WCCS caseworker and Tindall testified, a magistrate issued an April 2017 decision recommending that the court find that D.T. was an abused child pursuant to R.C. 2151.031(B) and (D) and a dependent child pursuant to R.C. 2151.04(C).  The magistrate further recommended that the court find that L.H.1 and L.H.2 were dependent children pursuant to R.C. 2151.04(C).  The juvenile court adopted the decisions on the same day. Mother objected to the magistrate's decisions but filed her notices of appeal before the court ruled on the objections.  Mother raises five

- 4 -

assignments of error in this appeal.

{¶ 18} Assignment of Error No. 1:

{¶ 19} THE TRIAL COURT ERRED BY PERMITTING A SOCIAL WORKER TO TESTIFY TO INADMISSIBLE HEARSAY.

{¶ 20} Mother argues that the juvenile court erred in admitting inadmissible hearsay, i.e., D.T.'s statements to Tindall concerning the alleged abuse. The court allowed Tindall's testimony pursuant to Evid.R. 803(4), the hearsay exception for statements made for purposes of medical diagnosis or treatment.[1] Mother argues that the evidence at the hearing did not support the conclusion that D.T.'s statements were for medical diagnosis or treatment.

{¶ 21} This court reviews challenges to the lower court's decision to admit or exclude evidence under the abuse of discretion standard. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Thornton*, 12th Dist. Clermont No. CA2012-09-063, 2013-Ohio-2394, ¶ 34. A decision is unreasonable when it is unsupported by a sound reasoning process. *State v. Roome*, 12th Dist. Madison No. CA2016-09-028, 2017-Ohio-4230, ¶ 8.

{¶ 22} At the adjudicatory stage of juvenile proceedings there must be strict adherence to the rules of evidence. *In re Theaderman*, 12th Dist. Brown Nos. CA2001-04-003, CA2001-04-004, CA2001-08-012, and CA2001-08-013, 2002 Ohio App. LEXIS 151, *15 (Jan. 18, 2002), fn. 2; and *In re Vickery*, 12th Dist. Butler No. CA89-05-076, 1990 Ohio App. LEXIS 5604, *5 (Dec. 17, 1990), citing *In re Baby Girl Baxter*, 17 Ohio St. 3d 229, 233

---

1. Prior to the adjudicatory hearing, Mother moved in limine to exclude Tindall's testimony concerning D.T.'s statements. The court denied the motion. Mother preserved her objection at the hearing.

(1985).[2] Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally inadmissible unless an exception to the hearsay rule applies. Evid.R. 802. Evid.R. 803(4) provides an exception to the hearsay rule as follows:

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

As explained by the staff notes, statements made for purposes of medical diagnosis or treatment have a "circumstantial guaranty of trustworthiness" because of the assumption that "a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements." Evid.R. 803(4), Staff Notes.

{¶ 23} Hearsay statements concerning abuse made by a child to a social worker may be admissible under the Evid.R. 803(4) exception *if* they are made for purposes of medical diagnosis or treatment. *See State v. Muttart,* 116 Ohio St.3d 5, 2007-Ohio-5267. The salient inquiry is whether the statement was made for purposes of medical diagnosis or treatment rather than for some other purpose. *State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 42, citing *Muttart* at ¶ 47. In making this determination, the court must consider the circumstances surround the child's statements. *Muttart* at ¶ 48. While the specific considerations may change, the Ohio Supreme Court has provided the following nonexhaustive list of factors: (1) the manner in which the child was questioned, (2) whether the child had any motive to fabricate abuse, (3) whether the child understood the need to tell the truth, (4) the age of the child, (5) whether the statements were elicited as part of a police investigation or with the intention of preserving a statement for trial (a "facade for state

---

2. The standard is relaxed at the dispositional stage, where the court has discretion to admit ordinarily inadmissible evidence. Juv.R. 34(B)(2).

action"), and (6) the circumstances by which the child came to be interviewed. *Id.* at ¶ 49, 61, 62.

**{¶ 24}** With respect to the manner in which Tindall questioned D.T., the recorded interview was not admitted into evidence. Tindall testified that she received training in interviewing methods to avoid suggestibility. Tindall's testimony specific to her interview with D.T. focused on the answers that D.T. provided concerning the abuse rather than the specific questions she asked of him. In sum, there is little evidence in the record from which we can determine whether D.T.'s statements were trustworthy based on Tindall's interview.

**{¶ 25}** There was no evidence in the record indicating that D.T. had any motivation to fabricate the abuse claims. With respect to whether D.T. understood the need to tell Tindall the truth, Tindall testified that when she met with D.T. she informed him that her job was simply to talk to people about "things that happened." Notably, Tindall admitted that she did not tell D.T. that he was at the CAC for purposes of medical diagnosis of treatment because "it's not my role." Thus, by Tindall's own account there is no evidence to indicate that D.T. understood he was being questioned for medical purposes.

**{¶ 26}** With respect to whether the statements were elicited for purposes of an agency investigation rather than medical concerns, Tindall testified that as a forensic interviewer at the CAC she acted as an agent for both medical workers and law enforcement. Any interviews she conducted would be recorded, and could then be shared with others on the CAC's multi-disciplinary team. Tindall noted that she sometimes made referrals for mental or medical health needs following an interview.

**{¶ 27}** Other than this generic testimony there is little in the record before us that supports the conclusion that D.T.'s statements to Tindall were made for purposes of medical diagnosis or treatment. Tindall testified that she tried to determine in the interview whether D.T. sustained physical injuries. However, the record contains little evidence clarifying the

questions she posed to D.T. on this subject. With respect to the location of the injuries, Tindall testified that D.T. said that Mother struck him on his "private parts." Tindall initially explained that she was not sure whether D.T. said "private parts" or used another phrase. Later, under cross-examination, Tindall indicated that D.T. said "private parts." Regardless, Tindall conceded that she did not know what part of D.T.'s body D.T. was referring to when he said "private parts." When asked why she would not have used a drawing or doll to assist in o0btaining this information Tindall stated that it was best practice not to use drawings or dolls and claimed that research had found that "it's best to let children use their own words." However, if a purpose of Tindall's interview was to gather information for potential medical treatment one would assume that she would use some method to determine a precise injury location. Her explanation is more sensible if the purpose of the interview was merely to confirm and create evidence in support of the agency's investigation.

{¶ 28} Tindall could not recall if D.T. stated that he had any marks or bruises on his body from the abuse. Tindall also could not recall if she asked D.T. a question concerning marks or bruises. Tindall did not look for bruises or ask to see any part of D.T.'s body where he claimed to have been abused because "that's not my role." Based upon the record before us, the evidence supports the conclusion that Tindall obtained D.T.'s statements for purposes of assisting the agency with its investigation and not for medical diagnosis or treatment.

{¶ 29} With respect to how D.T. came to be interviewed, maternal grandmother brought D.T. to the interview the day after an agency caseworker attempted to convince Mother and Father to enter D.T. into a safety plan. There is some indication in the record that maternal grandmother may have been the source of a report to the agency. WCCS sc0heduled the interview. The agency did not seek D.T.'s emergency removal for the alleged physical abuse the day of the report but instead was satisfied to wait until the next day to have him interviewed. Thus, this factor supports the conclusion that the agency sought the

interview to further its investigation and not because of medical concerns. After reviewing the relevant *Muttart* factors, this court concludes that the record contained insufficient evidence upon which the juvenile court could find that the statements made by D.T. to Tindall were for purposes of medical diagnosis or treatment.

{¶ 30} The agency argues that this case is indistinguishable from this court's past cases finding statements made by an abused child to an interviewing social worker admissible under Evid.R. 803(4). *State v. Kersbergen*, 12th Dist. Butler No. CA2014-10-218, 2015-Ohio-3103; *State v. Richardson*, 12th Dist. Clermont Nos. CA2014-03-023, CA2014-06-044, and CA2014-06-045, 2015-Ohio-824; *State v. Pence*, 12th Dist. Warren No. CA2012-05-045, 2013-Ohio-1388; and *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769. Those cases are distinguishable because in each some credible evidence supported a threshold determination that at least some of the statements made during the interview were for medical diagnostic reasons rather than exclusively in support of an agency or law enforcement investigation. In *Kersbergen* the child discussed various medical concerns about her body, including cramps and concerns that she was developing differently than other girls because of the abuse. *Id.* at ¶ 9, 27. In *Richardson*, the children's concerned mother took the children to a hospital where they were interviewed and the child physically examined and then referred for further interviews at a child advocacy center. *Id.* at ¶ 5, 33. In both *Pence* and *Gray*, the interviewer asked the child sex abuse victims to specify precisely where they had been touched using an anatomically correct drawing to assist with potential further medical evaluation. *Pence* at ¶ 37; *Gray* at ¶ 3. Additionally, in the cited cases the child victim either testified or all or portions of the interview were made part of the record. *Kersbergen* at ¶ 10; *Richardson* at ¶ 9; *Pence* at ¶ 37; *Gray* at ¶ 8. Finally, to extent this court found that certain statements were erroneously admitted, we also found that the error was either harmless or did not meet a plain error standard because of substantial other

evidence in the record supporting the court's findings. *Kersbergen* at ¶ 68; *Richardson* at ¶ 38, 43; *Pence* at ¶ 38; *Gray* at ¶ 51.

{¶ 31} In this case, the record contains little more than rote discussion of the purpose of the CAC and Tindall's role as a forensic interviewer. The evidence concerning the interview did not objectively reveal that the agency was investigating the alleged abuse for purposes of medical diagnosis or treatment. Accordingly, the juvenile court erred in allowing Tindall to testify as to D.T.'s statements.

{¶ 32} This error requires reversal. Pursuant to R.C. 2151.35(A), a juvenile court's adjudication of a child as abused, neglected, or dependent must be supported by clear and convincing evidence. *See also* Juv.R. 29(E)(4). An appellate court's review of a juvenile court's decision finding clear and convincing evidence is limited to whether there is sufficient, credible evidence in the record supporting the juvenile court's decision. *In re L.J.*, 12th Dist. Clermont No. CA2007-07-080, 2007-Ohio-5498, ¶ 12. A reviewing court will not reverse a finding by a juvenile court that the evidence was clear and convincing unless there is a sufficient conflict in the evidence presented. *In re A.F.*, 12th Dist. Brown No. CA2006-09-012, 2007-Ohio-1646, ¶ 10.

{¶ 33} Save for Tindall's inadmissible testimony, the record contains no clear and convincing evidence of abuse. D.T. did not testify. The guardian ad litem did not testify. The prosecutor did not submit any documentary evidence or photographs at the hearing. The WCCS caseworker observed no physical evidence of abuse during any of her three in-person interactions with the family. The WCCS caseworker testified that when she spoke to D.T. following the January 2017 report he reluctantly denied physical abuse. But the caseworker did not attempt to physically examine the child or seek an appropriate person to do the same. Thus, no credible, admissible evidence supported the juvenile court's finding that D.T. was an abused child.

{¶ 34} The juvenile court's findings of dependency were primarily based upon its finding that D.T. was an abused child. The court indicated that Mother's and Father's emotional response to the agency's allegation also supported its finding of dependency. However, Mother's and Father's behavior alone, though understandably concerning to the agency workers, does not constitute clear and convincing evidence that the children were dependent. Accordingly, because no admissible evidence exists to support the juvenile court's adjudications we sustain Mother's first assignment of error.

{¶ 35} Assignment of Error No. 2:

{¶ 36} THE TRIAL COURT ERRED BY ADJUDICATING ALL THREE CHILDREN AS DEPENDENT WHEN NO CHILD HAS BEEN SO ADJUDICATED PRIOR TO THE FILING OF THE COMPLAINTS AND IN THE ABSENCE OF CLEAR AND CONVINCING EVIDENCE TO SUPPORT THE ASSERTION.

{¶ 37} Assignment of Error No. 3:

{¶ 38} THE TRIAL COURT ERRED IN PERMITTING THE SOCIAL WORKER TO TESTIFY TO A LEGAL CONCLUSION ABOUT CHILD ABUSE, AND NO PROPER FOUNDATION WAS LAID TO QUALIFY THE WITNESS TO MAKE SUCH STATEMENT.

{¶ 39} Assignment of Error No. 4:

{¶ 40} THE TRIAL COURT ERRED IN RELYING ON THE ALLEGATIONS CONTAINED IN THE COMPLAINT INSTEAD OF THE INFORMATION ACTUALLY PRESENTED AT TRIAL, AND THE ADJUDICATIONS WERE NOT SUPPORTED BY SUFFICIENT, CREDIBLE EVIDENCE AND WERE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 41} Assignment of Error No. 5:

{¶ 42} THE TRIAL COURT ERRED IN REQUIRING [THE] PARTIES TO PROCEED WITH DISPOSITION OF THE CASE PRIOR TO RESOLUTION OF MOTHER'S OBJECTION

[TO] THE ADJUDICATORY FINDINGS.

{¶ 43} Mother's remaining assignments of error are rendered moot upon our resolution of Mother's first assignment of error and we need not address them. App.R. 12(A)(1)(c). Accordingly, this court overrules Mother's second through fifth assignments of error.

{¶ 44} Judgment reversed and the trial court's adjudicatory and dispositional orders are vacated.

S. POWELL, P.J., and PIPER, J., concur.