[Cite as *State v. Thornton*, 2013-Ohio-2394.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.  CA2012-09-063 |
| | : | O P I N I O N |
| - vs - | | 6/10/2013 |
| | : | |
| KEVIN THORNTON, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2007 CR 00792


D. Vincent Faris, Clermont County Prosecuting Attorney, Judith Brant, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for plaintiff-appellee

Donald R. Caster, University of Cincinnati College of Law, P.O. Box 210040, Cincinnati, Ohio 45221-0040, for defendant-appellant


**HENDRICKSON, P.J.**

{¶ 1}  Defendant-appellant, Kevin M. Thornton, appeals a decision of the Clermont County Common Pleas Court denying his motion for leave to file a delayed motion for new trial and his petition for postconviction relief.  For the reasons outlined below, we affirm the trial court's judgment.

{¶ 2}  This court has previously affirmed appellant's convictions for aggravated

robbery and kidnapping with firearm specifications. *State v. Thornton*, 12th Dist. No. CA2008-10-92, 2009-Ohio-3685. From that decision, the following facts were established:

> On September 11, 2007, at approximately 1:15 p.m., a man wearing sunglasses[, a pair of thin cotton or wool gloves,] and a hat entered the Cash Express on Main Street in the city of Milford, Clermont County, Ohio. The man walked up to the counter and asked store employee Leslie Fahey what he needed to do to obtain a loan. When Fahey walked around the counter to give him a brochure, the man pointed a handgun at her stomach and demanded money. When Fahey asked if he was serious, the man racked the slide on his handgun, thereby chambering a round in the weapon, and repeated his demand. Fahey handed over the contents of her cash drawer. The man then ordered Fahey to lie down on the floor, bound her hands and feet with zip ties, and told her not to scream or he would come back. After hearing nothing but silence, Fahey freed her hands, cut the zip tie on her feet and sent out an alarm using her computer.
>
> Even though the surveillance photographs of the robbery taken by the store's security camera did not show the robber's face, [three] Milford police officers believed that, given the perpetrator's height and posture, the robber was Thornton. When the police showed Fahey a photo lineup that did not include Thornton, but contained the photo of a known shoplifter, she did not identify any of the men in the lineup as being the robber. However, when the police showed Fahey a second photo lineup that contained Thornton's photograph, she identified Thornton as the man who robbed her.

*Id.* at ¶ 22-23.

{¶ 3} Thus, on the evening of September 11, 2007, police executed search warrants upon Thornton's apartment, the apartment of his girlfriend, and his mother's motor vehicle. When Sergeant Donald Mills of the Milford Police Department read Thornton the search warrant, Sergeant Mills did not mention that the warrant related to a robbery. However, Thornton explained to his mother, "They think I robbed the Cash Express. I think it's funny." Furthermore, Thornton initially stated that he was home with his mother "all day" but, when it was revealed that his mother had not been home all day, Thornton stated that he had slept all day. Thornton further explained that he knew about the Cash Express robbery because a

neighbor told him he looked like the robber.

{¶ 4} From Thornton's apartment the police seized a black "Cincinnati Reds" t-shirt that was found lying on a table and appeared to have been recently worn. The police also seized a pairs of sunglasses found lying underneath the "Cincinnati Reds" t-shirt. When later shown to Fahey, she identified the t-shirt and the pair of sunglasses as the items worn by the perpetrator during the robbery. However, the police did not find zip ties, a gun, money, or a black baseball cap in any of the locations searched.

{¶ 5} Thornton was placed under arrest the same night and later indicted on one count of aggravated robbery in violation of R.C. 2911.01(A)(1), a felony of the first degree, and one count of kidnapping in violation of R.C. 2905.01(A)(2), a felony of the first or second degree, depending on whether the offender released the victim in a safe place unharmed. Both counts were accompanied by firearm specifications pursuant to R.C. 2941.145. The pivotal issue at trial was Thornton's identity as the perpetrator. While Thornton's first trial ended in a hung jury in November 2007, Thornton was again tried by a jury on April 7-10, 2008 and was convicted as charged. Thornton was eventually sentenced to serve 12 years in prison on September 11, 2009.

{¶ 6} Approximately two years later, Thornton contacted the Ohio Innocence Project which requested that DNA testing be performed on the zip ties used to bind Fahey's feet and hands at the Cash Express. With the agreement of the Clermont County Prosecutor's Office, on November 9, 2011, the trial court entered an order to allow the collection of evidence for the purpose of DNA testing. DNA Diagnostics Center, a state-certified laboratory, performed Y-Chromosome Short Tandem Repeat (Y-STR) DNA testing on the zip ties.

{¶ 7} "DNA testing has become a forensic tool by which technology can increase the public's confidence in the judicial system." *State v. Elliott*, 1st Dist. No. C-050606, 2006-Ohio-4508, ¶ 6. "'The Y Chromosome is the DNA in the nucleus of a cell that is present only

in males.'" *Id.*, quoting C.J. Word, *The Future of DNA Testing and Law Enforcement (2001), Speech at the Brooklyn Law School Symposium on DNA: Lessons From the Past-Problems For the Future*, in 67 Brooklyn L.Rev. (Fall 2001), 249, 251, fn. 5. Y-STR testing became a regularly employed form of DNA testing around 2002 and is typically utilized "where DNA evidence includes a mixture of male and female DNA." *State v. Metcalf*, 12th Dist. No. CA2010-12-326, 2012-Ohio-674, ¶ 16, citing *State v. Prade*, 126 Ohio St.3d 27, 2010-Ohio-1842, ¶ 21-23; U.S. Department of Justice (July 2002), Using DNA to Solve Cold Cases, at 5. Y-STR DNA testing is used for both sexual assault and non-sexual assault cases where mixed samples are collected from evidence. Specifically, Y-STR DNA is useful in cases where there is a small amount of male DNA that may be overwhelmed by female DNA in a mixed sample. *See Prade* at ¶ 21.

{¶ 8}  In this case, the Y-STR DNA testing performed on the zip ties revealed a single male DNA profile that did not match that of Thornton. With the agreement of Thornton, the entire DNA testing file was submitted to the Ohio Bureau of Criminal Identification and Investigation ("BCI"). BCI's Dr. Elizabeth Benzinger confirmed that the Y-STR DNA testing was performed correctly. Further BCI's testing of the DNA revealed that the DNA found on the zip ties did not match any of the law enforcement officers who worked the crime scene at the Cash Express on September 11, 2007, thereby eliminating the possibility of   accidental contamination.[1]

{¶ 9}  In addition to the Y-STR DNA testing, the Ohio Innocence Project also contacted Philip F. Locke, Jr., a member of the American Society for Photogrammetry and Remote Sensing, to perform a photogrammetric analysis of the surveillance video. According

---

1. Though not in the record, defense counsel indicates that she received a phone call from Clermont County Assistant Prosecutor David Hoffman informing her that he had inadvertently touched the zip ties after Thornton's last trial but that his DNA was also not the male profile found on the zip ties.

to Locke, photogrammetry is a science based on triangulation which measures an object in a space where a photograph was taken. A photogrammitrist uses the lines of sight to mathematically produce three-dimensional coordinates to determine specific characteristics like the height of an object or individual.

{¶ 10} According to Locke's photogrammetric analysis, the perpetrator in the surveillance photos captured September 7, 2011 was approximately 5'11" tall with an accuracy rate of plus or minus three-fourths of an inch. Thus, the perpetrator could be no more than 6 feet tall. As the parties stipulated at the 2008 trial that Thornton is 6'3" tall, Locke determined that "it is clear to a reasonable degree of scientific certainty that the perpetrator could not possibly be Kevin Thornton."

{¶ 11} Based upon the DNA testing and photogrammetric analysis, the Ohio Innocence Project and Thornton moved for leave to file a delayed motion for a new trial and petitioned for postconviction relief on June 4, 2012. On August 17, 2012, after a hearing on the motion for leave to file for a new trial, the trial court denied both the motion and the petition, despite a finding that the photogrammetry evidence would have been compelling to a jury.

{¶ 12} From the trial court's denial of his motion for leave to move for a new trial and petition for postconviction relief, Thornton appeals, raising two assignments of error.

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE TRIAL COURT ERRED IN DENYING [THORNTON'S] MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL.

{¶ 15} In his first assignment of error, Thornton argues that, when "exonerative evidence" is beyond the reach of a defendant within 120 days of his trial, he is unavoidably prevented from discovery of that evidence and should be granted leave to file a motion for a new trial.

{¶ 16} Crim.R. 33(A)(6) provides the following as one of the grounds upon which a new trial may be granted on a defendant's motion:

> When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given * * *.

{¶ 17} Crim.R. 33(B) further provides the following limitations on the time in which such a motion can be filed:

> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered * * *. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Because appellant's motion was filed well outside the 120-day period, he was required to obtain leave of court to file his motion for new trial. *See State v. Williams,* 12th Dist. No. CA2003-01-001, 2003-Ohio-5873, ¶ 17.

{¶ 18} When seeking leave to file a motion for new trial, the moving party must establish by "clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely[.]" *Id.*, citing Crim.R. 33(B). Unavoidable delay results "when the party had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the required time in the exercise of reasonable diligence." *State v. Rodriguez-Baron*, 7th Dist. No. 12-MA-44, 2012-Ohio-5360, ¶ 11, citing *State v. Walden*, 19 Ohio App.3d 141, 146 (10th Dist.1984).

{¶ 19} "Clear and convincing proof requires more than a mere allegation that a defendant has been unavoidably prevented from discovering the evidence he seeks to

introduce as support for a new trial." *State v. Covender*, 9th Dist. No. 11CA010093, 2012-Ohio-6105, ¶ 14; *Williams* at ¶ 17; *State v. Mathis*, 134 Ohio App.3d 77, 79 (1st Dist.1999). "The requirement of clear and convincing evidence puts the burden on the defendant to *prove* he was unavoidably prevented from discovering the evidence in a timely manner." (Emphasis added). *Rodriquez-Baron* at ¶ 11, citing *State v. Fortson*, 8th Dist. No. 82545, 2003-Ohio-5387, ¶ 12.

{¶ 20} If leave of court is given to file a motion for a new trial, the defendant must then demonstrate that the newly discovered evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), syllabus.

{¶ 21} Crim.R. 33 motions for a new trial are not to be granted lightly. *City of Toledo v. Stuart*, 11 Ohio App.3d 292, 293 (6th Dist.1983). Thus, the denial of a motion for a new trial on the grounds of newly discovered evidence will not be disturbed on appeal absent an abuse of discretion. *State v. Barnes*, 12th Dist. No. CA99-06-057, 1999 WL 1271665, *1 (Dec. 30, 1999), citing *State v. Scheibel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *See State v. Darmond,* 135 Ohio St.3d 343, 2013-Ohio-966, ¶ 34.

{¶ 22} In this case, Thornton argues that both the DNA evidence and the photogrammetry analysis were unavoidably unavailable to him until long after trial. Thornton further contends that, had the evidence been presented at trial, there is a strong probability he would not have been found guilty. We find these arguments unpersuasive.

{¶ 23} As to the Y-STR DNA evidence, Thornton is unable to clearly and convincingly demonstrate that he was unavoidably prevented from discovering the DNA evidence before trial or within 120 days after the verdict was rendered. Thornton acknowledges that private laboratories, including DNA Diagnostics Center, were performing Y-STR DNA testing as early as 2005 and certainly in 2007 and 2008 when Thornton's trials were held. However, Thornton's trial counsel acknowledges in an affidavit that he was unaware of Y-STR DNA testing at the time of the trials and that failing to pursue Y-STR DNA testing was not part of his "trial strategy." Trial counsel further admits that he "did not contact any DNA laboratories at the time of either of Kevin Thornton's trials to ascertain whether advanced DNA technologies could help [Thornton's] case."

{¶ 24} Nevertheless, trial counsel's statements that he did not make an effort to test the zip ties and that this was not part of his "trial strategy" do not establish through clear and convincing proof that Thornton was unavoidably prevented from discovering the Y-STR DNA evidence or any DNA evidence. United States courts began introducing DNA evidence in criminal cases as early as 1987 and its use was gradually accepted over the next few decades. Schaffter, *Postconviction DNA Evidence: A 500 Pound Gorilla in State Courts* (2002), 50 Drake L.Rev. 695, 699-700 (footnotes omitted). Furthermore, there is nothing in the record to indicate that Y-STR DNA testing is the best—or only—form of DNA testing available in this type of case and Thornton was well aware of the zip ties during his 2007 and 2008 trials. Thus, Thornton fails to demonstrate, by clear and convincing evidence, that he—with or without the assistance of trial counsel—was unavoidably prevented from seeking the use of any DNA testing, let alone Y-STR DNA testing, at his trials in 2007 or 2008 or within the following 120 days of the guilty verdict.

{¶ 25} As to the photogrammetry analysis of the still frame of the surveillance video taken from the Cash Express, there is no evidence that Thornton was unavoidably prevented

from the discovery of this evidence prior to trial or 120 days after the verdict was reached. Rather, the video surveillance footage was available to Thornton and his trial counsel prior to the commencement of his first trial in 2007. In fact, Thornton's trial counsel made an argument at the 2008 trial that the man depicted in the surveillance footage was significantly shorter than Thornton and, therefore, Thornton could not have been the perpetrator. Specifically, trial counsel stated during closing arguments:

> Now, this one if you look at the heights here [indicating a video still of the surveillance footage], it's obvious to me anyway if you look at it and you examine it—and [Fahey] told us she was about 5 feet 6 inches tall. Ladies and gentlemen, this person here [indicating the perpetrator] is not 6 feet 3 inches standing next to her. You know, this person probably is closer. She may have been right about the 6 feet height that she gave in her initial description to Police Officer Lane, all right?
>
> I mean, they're right there. Their heads are almost—I mean, there is not—if she's 5 foot 6, there is not a 9-inch difference in this photo between her height and the height of this person who is the suspect here, the robber, okay? If Kevin Thornton was standing there, he'd be up here some place. He'd be up a lot higher. Take a look at these things.

While trial counsel did not solicit an expert to perform a photogrammetric analysis and argue this point, the evidence and this argument were clearly available to Thornton at the time of trial and, thus, there is no reason why he was unavoidably prevented from discovering the evidence prior to the running of the 120-day time period of Crim.R. 33.

{¶ 26} Thornton also claims that he was financially unable to acquire DNA and photogrammetric testing at the time of trial and was, therefore, unavoidably prevented from obtaining this exonerating evidence. Yet, there is no evidence in the record that Thornton ever petitioned the trial court for funds to hire an expert or perform DNA testing. As Thornton presents no reason why petitioning the trial court for funds was not an option to him prior to trial, this court cannot say that Thornton was unavoidably prevented from obtaining the DNA and photogrammetric testing simply because of his financial status.

{¶ 27} Finally, in viewing the DNA evidence and photogrammetry analysis in the context of the record as a whole, we do not find that the "new" evidence disclosed a strong probability that it would change the outcome if a new trial were granted. As discussed in more detail below, the DNA evidence did not disprove that Thornton committed the crime but only demonstrated that another male came in contact with the zip ties. In addition, the photogrammetric evidence is cumulative to the argument presented by Thornton's trial counsel that Thornton was too tall to be the man depicted in the surveillance footage. Though the photogrammetric analysis could have bolstered this argument, the jury still heard evidence regarding Thornton's height and the disparity between his height and the height of the man depicted in the surveillance footage. Thus, discovery of the photogrammetric analysis does not establish a strong probability that the outcome of the trial would have been different had this evidence been available and admitted.

{¶ 28} As provided by the Tenth Appellate District, "the phrases in Crim.R. 33(B) requiring an appellant to show by 'clear and convincing proof' that he or she was 'unavoidably prevented' from discovering evidence do not allow one to claim that evidence was undiscoverable simply because the defense did not undertake efforts to obtain the evidence sooner." *State v. Anderson*, 10th Dist. No. 12AP-133, 2012-Ohio-4733, ¶ 14. Thornton fails to explain why neither he nor his trial counsel could have timely discovered the DNA or photogrammetric evidence. Bald assertions that Thornton could not have timely discovered the evidence is not enough. *See id.* Moreover, "criminal defendants and their trial counsel have a duty to make a 'serious effort' of their own to discover potential favorable evidence." *Id.*

{¶ 29} As such, we find that the trial court did not abuse its discretion in denying Thornton's motion for leave to move for a new trial. Accordingly, Thornton's first assignment of error is overruled.

{¶ 30} Assignment of Error No. 2:

{¶ 31} THE TRIAL COURT ERRED IN DENYING [THORNTON'S] PETITION FOR POSTCONVICTION RELIEF.

{¶ 32} In his second assignment of error, Thornton contends the trial court improperly denied his petition for postconviction relief ("PCR petition"). Specifically, Thornton argues that his PCR petition should have been granted as (1) he was unavoidably prevented from discovering DNA and photogrammetric evidence due to the ineffective assistance of his trial counsel, and (2) the DNA testing, in conjunction with other evidence, demonstrated his actual innocence.

{¶ 33} PCR petitions are governed by R.C. 2953.21, which states, in pertinent part:

> (A)(1) Any person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief.

{¶ 34} A postconviction proceeding is not an appeal of a criminal conviction, but a collateral civil attack on a criminal judgment. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 1999-Ohio-102; *State v. Bell*, 12th Dist. No. CA2001-08-197, 2002-Ohio-1341, ¶ 5. "In reviewing an appeal of postconviction relief proceedings, this court applies an abuse of discretion standard." *State v. Widmer*, 12th Dist. No. CA2012-02-008, 2013-Ohio-62, ¶ 28, citing *State v. Wagers*, 12th Dist. No. CA2011-08-007, 2012-Ohio-2258, ¶ 15. "A reviewing court should not overrule the trial court's findings on a petition for postconviction relief that is supported by competent and credible evidence." *Id.*, citing *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 58. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or

- 11 -

unconscionable." *Id.*

**{¶ 35}** Pursuant to R.C. 2953.21(A)(2), a PCR petition shall be filed no later than 180 days after the case is appealed or after the expiration of the time for filing an appeal. However, under R.C. 2953.23(A), a petitioner may file a PCR petition outside the 180-day window if "the petitioner establishes one of the two following conditions:

> (1) "[(a)] The petitioner was either unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief * * * *and* [(b)] the petitioner shows by clear and convincing evidence that, but for the constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted.

> (2) "The petitioner was convicted of a felony and upon consideration of all available evidence related to the inmate's case * * *, and the results of the DNA testing establish, by clear and convincing evidence, actual innocence of that felony offense."

(Internal quotations omitted). *State v. Harris*, 8th Dist. No. 89156, 2008-Ohio-934, ¶ 22-24, quoting R.C. 2953.23(A).

**{¶ 36}** After a review of the record, it is our view that Thornton did not establish either of the conditions set forth in R.C. 2953.23(A) that would have given the trial court jurisdiction to entertain his petition.

**{¶ 37}** As discussed in our review of Thornton's first assignment of error, Thornton failed to demonstrate that he was unavoidably prevented from discovering and presenting the DNA and photogrammetric evidence at trial and he has failed to establish, by clear and convincing evidence, that he would not have been found guilty had this evidence been presented at trial. Thus, Thornton has failed to establish that he was unavoidably prevented from discovering new evidence pursuant to R.C. 2953.23(A)(1)(a).

**{¶ 38}** As such, this court need not address Thornton's additional argument pursuant to R.C. 2953.23(A)(1)(b) that, but for the constitutional error of ineffective assistance of trial

counsel, no reasonable factfinder would have found Thornton guilty. *See State v. Turner*, 10th Dist. No. 06AP-876, 2007-Ohio-1468, ¶ 18 ("Because the two prongs set forth in R.C. 2953.23 are stated in the conjunctive, and we have found appellant failed to satisfy the first prong under R.C. 2953.23(A)(1)(a), we need not address whether appellant presented clear and convincing evidence demonstrating that no reasonable fact finder would have found him guilty in the absence of the alleged constitutional error, pursuant to the second prong in R.C. 2953.23(A)(1)(b)").

{¶ 39} Nevertheless, even if Thornton had met the requirements of R.C. 2953.23(A)(1)(a), Thornton fails to establish the constitutional error of ineffective assistance of counsel. As discussed in greater detail below, Thornton failed to demonstrate that, had the DNA and photogrammetric evidence been introduced at trial, the result of the trial would have been different. Though this information could certainly have been beneficial to Thornton's case, the DNA evidence does not conclusively eliminate Thornton as the perpetrator and the discrepancy between Thornton's height and the height of the man shown in the surveillance footage was argued by trial counsel. Thus, even had Thornton satisfied the requirements of R.C. 2953.23(A)(1)(a) by demonstrating that he was unavoidably prevented from discovering the DNA and photogrammetric evidence within 180 days, Thornton could not satisfy the requirements of R.C. 2953.23(A)(1)(b) as he is unable to show that, but for the ineffectiveness of his trial counsel in not presenting the DNA and photogrammetric evidence, he would not have been found guilty.

{¶ 40} Additionally, Thornton has failed to demonstrate that the DNA testing establishes, by clear and convincing evidence, his actual innocence pursuant to R.C. 2953.23(A)(2). "Actual innocence" under R.C. 2953.21(A)(1)(b) "means that, had the results of the DNA testing * * * been presented at trial, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's

- 13 -

case * * * no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted * * *."

{¶ 41} Here, Thornton argues that, because his DNA was not found on the zip ties, he could not be the perpetrator of the aggravated robbery and kidnapping on September 7, 2011 and, therefore, the DNA evidence proves his "actual innocence." However, though the DNA test results raise a doubt that Thornton was the perpetrator, "'doubt' does not rise to the level of 'actual innocence' under R.C. 2953.21(A)(1)(b); i.e., that no reasonable factfinder would have found [Thornton] guilty." *Harris*, 2008-Ohio-934 at ¶ 27.

{¶ 42} The Y-STR DNA testing performed on the zip ties does not unequivocally show that Thornton was not the perpetrator of the aggravated robbery and kidnapping on September 7, 2011. Rather, the DNA testing provides only that another man's DNA was found on the zip ties. Evidence at the trial revealed that the perpetrator in this case wore gloves during the commission of the aggravated robbery and kidnapping. Although Thornton argues that (1) the perpetrator did not likely wear gloves while purchasing the zip ties or placing them in his pocket and (2) that DNA could have transferred from the perpetrator to the zip ties if, while wearing gloves, the perpetrator "touched his sweaty face" or "put his finger in his ear," these arguments do not establish Thornton's actual innocence or that the jury would not have found him guilty had this information been admitted at trial. The DNA on the zip ties could just as easily have come from a factory-worker who manufactured the zip ties or a store clerk who stacked the zip ties on the shelf or sold the zip ties. As stated by the trial court, these "competing possibilities indicate a weight of the evidence issue that the jury could have pondered had this evidence been presented to it, but it does not establish [Thornton's] actual innocence of the crimes by clear and convincing evidence."

{¶ 43} In addition, the other available and admissible evidence presented at trial in Thornton's case, in combination with the DNA evidence, does not prove Thornton's actual

innocence. At trial, (1) a friend of Thornton's testified that Thornton confessed to the crime, (2) Thornton commented to his mother that the police thought he had robbed the Cash Express before any mention of the aggravated robbery had occurred, (3) Fahey selected Thornton out of a photo lineup after seeing a previous photo lineup that did not include Thornton's photograph, (4) Fahey identified clothing taken from Thornton's apartment as the clothing worn by the perpetrator during the commission of the crime, and, finally, (5) three Milford police officers individually identified Thornton as the perpetrator based upon their viewing of the surveillance video.

{¶ 44} Thornton argues that the results of the photogrammetric analysis should have been considered in the trial court's determination of whether a reasonable factfinder would have found him guilty of aggravated robbery and kidnapping in light of the DNA results, "being analyzed in the context and upon consideration of all admissible evidence." However, we find no error in the trial court's refusal to consider the results of the photogrammetric analysis as Thornton (1) failed to admit such evidence at trial in 2008 and (2) failed to demonstrate that he was "unavoidably prevented" from presenting such evidence as contemplated by R.C. 2953.23(A)(1).

{¶ 45} Thus, based upon our review of the DNA evidence in context of the other available admissible evidence, we find that the trial court's ruling that Thornton failed to satisfy the requirements of R.C. 2953.23(A)(2) was not an abuse of discretion.

{¶ 46} We find that the trial court did not err in denying Thornton's PCR petition, as he did not satisfy the requirements of R.C. 2953.23(A)(1) or (2). Accordingly, Thornton's second and final assignment of error is overruled.

{¶ 47} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.

- 15 -