[Cite as *State v. Stepp*, 2020-Ohio-6901.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|                      |   |                          |
|----------------------|---|--------------------------|
| STATE OF OHIO,       | : |                          |
| Appellee,            | : | CASE NO. CA2020-05-062   |
|                      | : | O P I N I O N            |
| - vs -               |   | 12/28/2020               |
|                      | : |                          |
| BRIAN T. STEPP,      | : |                          |
| Appellant.           | : |                          |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2004-02-0266

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Brian T. Stepp, #A548413, Richland Correctional Institution, P.O. Box 8107, Mansfield, Ohio 44905, pro se

**HENDRICKSON, P.J.**

{¶1} Appellant, Brian Stepp, appeals from the decision of the Butler County Court of Common Pleas denying his motion for leave to file a delayed motion for new trial. For the reasons outlined below, we affirm the trial court's decision.

{¶2} In April 2004 Stepp was indicted for three counts of rape, three counts of kidnapping, one count of sexual battery, and three counts of impersonating a peace officer.

Prior to trial, the three counts of impersonating a peace officer were dismissed. In 2007, following a four-day jury trial, Stepp was found guilty of the remaining counts of the indictment and the trial court imposed an aggregate 55-year prison sentence. Stepp appealed his conviction and sentence, and this court affirmed. *State v. Stepp,* 12th Dist. Butler No. CA2007-05-117, 2008-Ohio-4305, ¶ 97. Our decision in that appeal summarized the facts leading to Stepp's conviction as follows:

> In late 2003, C.T. was working as a prostitute in the city of Hamilton, in Butler County, Ohio. One night in November of that year, she was standing near the intersection of Lincoln Street and Dixie Highway when a man in a red car pulled up to her and offered her a ride. C.T. got into the man's car, believing he was going to be a "customer."
>
> Immediately after she did, the man started driving very fast down Lincoln Street and towards Route 4, onto which he turned north. C.T. began to get nervous after the man refused to tell her what "services" he wanted her to perform for him. When she again asked him what he wanted, the man pulled out a badge and told her she was under arrest for prostitution. He ordered her to put on her seatbelt, to lock her door, and not to think about running, because he had a gun, and he was "allowed to shoot her" and even "kill" her, and "nobody will think twice about it."
>
> The man drove C.T. to the parking lot of a "police station" in Liberty Township and told her she could do him a "favor" or he could have her arrested. When C.T. refused to do him a favor, the man drove out of the police station's parking lot and then to a corn field, where he ordered her to get out the car and to get undressed. He then forced her to perform oral sex on him.
>
> Afterwards, the man told C.T. stories about different scenarios he allegedly had encountered as a police officer. He then ordered her to get dressed, handcuffed her, and placed her back in his car. When he tried to frisk C.T., she tried to escape. He eventually overpowered her by kicking her and punching her in the head. He then drove out of the corn field and over to a small house.
>
> At the house, the man led C.T. to a bathroom and ordered her to take a shower. When he left the room, C.T. tried to escape by climbing out the bathroom window; however, when the man saw what she was doing, he grabbed her hair, pulled her back

inside the bathroom, slapped her, and threatened her. He then stayed until she got into the shower. After C.T. finished showering, the man made her come into the living room, where he forced her to have intercourse with him. After telling her more fictitious stories about his experiences as a police officer, he ordered C.T. to get dressed and then drove her to a convenience store near Cincinnati-Dayton Road, where he dropped her off.

H.K. was another prostitute who worked in Hamilton at this time. On an early evening in late December 2003 or early January 2004, H.K. was standing in the area of North 7th Street when a man in a red car pulled up to her and offered her a ride. After H.K. got into the car, the man told her someone named "Jewel" told him she (H.K.) was a "snitch," and "a drug dealer had hired him to beat [her] up." At that point, H.K. believed that the man was threatening her life.

As the man drove H.K. into the city of Fairfield and onto Bobmeyer Road, he told her he was a police officer and showed her a badge. He also showed her a knife he had with him and told her he was going to hurt her because he had been hired to do so. The man drove to the end of a lane off Bobmeyer Road, back by a small house or church, and parked there. He then forced H.K. to perform oral sex on him.

* * *

J.G. was another prostitute who worked in Hamilton at the time of these events. One afternoon in November 2003, she was standing in the area of Sycamore and Ludlow Streets when she saw a red car that "kept circling." When the car finally pulled over, J.G. got in.

Shortly thereafter, the man who was driving the car told J.G. he was a police officer. When she asked him to stop the car and let her out, the man refused to let her leave. He drove her to Tylersville Road, turned onto a dirt road, and then drove to a corn field where he parked. The man went to the passenger side of the vehicle, pressed his forearm against J.G.'s neck, pulled her pants down, and raped her.

* * *

C.T., H.K., and J.G. did not immediately report these crimes to the police. However, on February 12, 2004, H.K. finally told the police what had happened to her on the night she was raped when she was being questioned by them on an unrelated matter. She gave the police the license plate number of the red car that was driven by the man who sexually assaulted her. The

police tracked the license plate number to Brian Stepp. Detective Ken Hardin showed H.K. a photo array of suspects that contained Stepp's photograph and asked her to identify the man who raped her. It took H.K. only "a few seconds" to pick out Stepp's photograph.

Within the next five days, the police also interviewed C.T. and J.G., who told the police what Stepp had done to them in November 2003. When Detective Hardin showed C.T. and J.G. a photo array that contained Stepp's photograph, both of them picked out Stepp's photograph and identified him as the man who had raped them.

*Id.* at ¶ 2-14.

{¶3} Since Stepp's convictions and sentence were upheld on appeal, Stepp has continuously filed a variety of pleadings in both federal and state courts in an attempt to set his convictions and/or sentence aside, but to no avail. *See Stepp v. Warden*, S.D.Ohio No. 1:10-cv-282, 2011 U.S. Dist. LEXIS 131123 (Nov. 14, 2011); *State v. Stepp*, 12th Dist. Butler No. CA2013-12-226 (Feb. 02, 2015) (Accelerated Calendar Judgment Entry); *State v. Stepp*, 12th Dist. Butler No. CA2016-12-232 (May 1, 2017) (Accelerated Calendar Judgment Entry); *Stepp v. Warden*, S.D.Ohio No. 1:16-cv-283, 2018 U.S. Dist. LEXIS 74813 (May 3, 2018).

{¶4} In August 2019, approximately 12 years after his initial appeal, Stepp moved the trial court for leave to file a delayed motion for new trial based upon newly discovered evidence. A few weeks later, in September 2019, Stepp moved the trial court to withdraw his motion.

{¶5} In November 2019, Stepp filed a second motion for leave to file a motion for new trial based on newly discovered evidence. Stepp also filed an affidavit in support of his motion. In the affidavit, Stepp alleged he had recently obtained exculpatory evidence as a result of his "friend[s] and/or family * * * asking questions and filing public records requests[.]" Stepp attached the alleged newly-acquired evidence to his affidavit, which

- 4 -

included a portion of Detective Hardin's testimony at trial, summaries of allegations against Stepp by two additional complainants, R.R. and S.S., an Inmate Services Request Form completed by S.S. ("inmate request form"), and a portion of Detective Hardin's criminal investigation report regarding Stepp's case.

{¶6} With regard to R.R., the criminal investigation report attached to Stepp's affidavit indicated Detective Hardin interviewed R.R. on February 19, 2004. A summary of the interview was included in the report.

{¶7} During the interview, R.R. indicated that on or about October 27, 2003, she was approached by a man in a small red car in regards to sex. According to R.R., she refused the man's offer and he advised her she was under arrest for soliciting and flashed her a sliver shield. At that point, R.R. got into the man's car and he indicated he was almost off-duty and threatened to take her to "his office" near Princeton Road. The man proceeded to drive R.R. to a park near the woods, where he told R.R. that if she performed oral sex on him, he would let her go. Fearing for her life, and believing the man was a police officer, R.R. agreed. Afterward, the man admitted he was not a police officer and drove to his home, with R.R., to retrieve something. While at the man's home, R.R. made a few calls and went to the bathroom. When R.R. left the bathroom, the man grabbed her and "start[ed] to force himself on her to have sex." Ultimately, the man did not have sex with R.R., and instead drove her to Hamilton where he dropped her off. Prior to exiting the car, R.R. asked the man what his name was. At that point, the man showed her his driver's license which identified his name as Brian. Near the end of the report Detective Hardin indicated R.R. looked at the photo line-up and "picked Stepp."

{¶8} Regarding S.S., the inmate request form attached to Stepp's affidavit stated the following:

Brian Stepp the man that is incarserated (sic) RAPED me 2

- 5 -

times [and] broke my pinky finger w/ (sic) a friend of his in an alley behind McDonalds on Rt. 4. He also raped me off Chestnut St after posing as a H.P. Officer in an alley [and] made me perform oral sex on him forcefully after picking me up on East Ave. He was looking to buy sex for 20.00 from me. I got in the car w/ (sic) him [and] this is what he did to me not counting my friends also I would love to see him pay.

The inmate request form is dated July 2, 2004 and indicates it was forwarded to Detective Hardin on July 8, 2004.

{¶9} Stepp also attached to his affidavit a transcript of Detective Hardin's testimony at trial. According to the portion of the transcript attached, Detective Hardin testified that four additional women came forward and complained of an offense against Stepp, but they never "picked him out." Detective Hardin further testified he had no record of the identity of the additional women that came forward and that, in January 2004, he had no record, notes, or recorded information regarding the stories those women provided to him, and that no recorded information related to their allegations existed.

{¶10} According to Stepp's motion, his discovery of the investigation report and inmate request form entitles him to a new trial because the documents prove Detective Hardin was aware of additional complainants that could identify Stepp, contrary to the detective's testimony at trial.

{¶11} In February 2020, Stepp moved the trial court to amend his motion for leave to file a delayed motion for a new trial, claiming he wished to include an additional claim for relief based upon the state's response to his previous motion. The new claim alleged the state knowingly presented the false testimony of Detective Hardin, which is prohibited by *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173 (1959).

{¶12} In May 2020, the trial court denied each of Stepp's pending motions. In its written decision, the trial court found the following: (1) Stepp had failed to establish by clear and convincing evidence that he could not have learned of the existence of the newly

discovered evidence, and thus was unavoidably prevented from filing his motion for new trial within the 120-day period; (2) Stepp had failed to seek leave to file his motion for new trial within a reasonable time after the 120-day period; (3) Stepp had failed to demonstrate that the newly-discovered "withheld evidence" disclosed a strong probability that it will change the result of the original trial if a new trial is granted; (4) The newly-discovered "withheld evidence" merely impeaches or contradicts former evidence; (5) The "withheld evidence" is inculpatory, and therefore is not material to Stepp's guilt; and (6) Stepp was not entitled to a new trial under *Napue v. Illinois*.

{¶13} Stepp now appeals from the trial court's decision denying his motion for leave to file a delayed motion for a new trial, raising the following assignment of error for our review:

{¶14} THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN VIOLATION OF THE SIXTH, FIFTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN IT DENIED APPELLANT LEAVE TO FILE HIS NEW TRIAL MOTION.

{¶15} On appeal, Stepp claims the trial court abused its discretion in denying his motion for leave to file a delayed motion for a new trial.

{¶16} An appellate court reviews a trial court's denial of leave to file a delayed motion for new trial under an abuse of discretion standard. *State v. Young*, 12th Dist. Butler No. CA2018-03-047, 2019-Ohio-912, ¶ 32. An abuse of discretion is more than an error of law or judgment. *State v. Williams*, 12th Dist. Butler No. CA2003-01-001, 2003-Ohio-5873, ¶ 16. In order to constitute an abuse of discretion, the court's attitude must be unreasonable, arbitrary, or unconscionable. *Id.*

{¶17} According to Crim.R. 33(B), a motion for a new trial based on a claim of newly-discovered evidence must be filed within 120 days after the day upon which the verdict was

rendered. The rule permits an untimely motion if the trial court finds by clear and convincing evidence that the defendant was unavoidably prevented from discovering the evidence within the given time frame. Crim.R. 33(B). Clear and convincing evidence is the measure or degree of proof that is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt, which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. *State v. Belcher*, 12th Dist. Warren No. CA2016-12-102, 2017-Ohio-6943, ¶ 14.

{¶18} Therefore, Stepp must establish by "clear and convincing proof that [he] was unavoidably prevented from the discovery of the evidence upon which he must rely." *State v. Thornton*, 12th Dist. Clermont No. CA2012-09-063, 2013-Ohio-2394, ¶ 18, citing Crim.R. 33(B). Unavoidable delay results "'when the [appellant] had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the required time in the exercise of reasonable diligence.'" *Id.*, quoting *State v. Rodriguez-Baron*, 7th Dist. Mahoning No. 12-MA-44, 2012-Ohio-5360, ¶ 11. Clear and convincing proof requires Stepp to establish more than a mere allegation he was unavoidably prevented from discovering the evidence he now seeks to introduce to support his motion for leave to file a motion for new trial. *Thornton* at ¶ 19.

{¶19} Because the present matter is well outside the 120-day period, Stepp was required to obtain leave of court to file a motion for new trial. *Williams*, 2003-Ohio-5873 at ¶ 17. If leave of court is given to file a motion for new trial, the defendant must then demonstrate the alleged newly discovered evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505

(1947), syllabus.

{¶20}   Upon review, we find no abuse of discretion in the trial court's denial of Stepp's motion for leave to seek a new trial.  As discussed above, the trial court initially denied Stepp's motion on the basis of untimeliness, concluding there was no clear and convincing evidence that Stepp had been unavoidably prevented from discovering his new evidence sooner.  We find the record supports this conclusion, as Stepp failed to establish he could not have learned of the existence of his new evidence within the required time in the exercise of reasonable diligence.

{¶21}   The record reflects Stepp obtained the prison request form and investigation report via a public records request filed by Stepp's friend.  In his motion and supporting affidavit, Stepp alleged he obtained the evidence in August 2019.  Despite Stepp's allegation that he only recently obtained the documents, the record indicates the prison request form, dated in July 2004, and the investigation report from February 2004, existed long before Stepp filed his motion in November 2019.  Stepp does not dispute that his evidence was likely available prior to 2019.  Rather, Stepp claims he was prevented from discovering the evidence within the 120-day period, or any time sooner than 2019, due to prosecutorial misconduct, ineffective assistance of counsel, violations pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), and Detective Hardin's testimony.[1]  Aside from an allegation that, based upon Detective Hardin's testimony, Stepp did not believe the evidence existed, Stepp offers no explanation as to how any of the above prevented him from filing a public records request sooner.  As noted above, Stepp is required to establish more than a mere allegation he was unavoidably prevented from discovering the evidence he now seeks to introduce to support his motion for leave to file a motion for new trial.

1. We note that Stepp's ineffective assistance of counsel claim and initial claim pursuant to *Brady* were previously found by this court to be without merit.  *Stepp*, 2018-Ohio-4305 at ¶ 40-55, 31-37.

*Thornton* at ¶ 17.

{¶22} Furthermore, the record is clear that, despite the alleged prosecutorial misconduct, ineffective assistance of counsel, *Brady* violations, and false testimony, Stepp was not prevented from accessing the information via a public records request in 2019. There is no evidence in the record that indicates such access was limited prior to that time and Stepp has provided no evidence that an earlier public records request would not have produced the same documents he relies upon now. As this court has previously stated, "the phrases in Crim.R. 33(B) requiring an appellant to show by 'clear and convincing proof that he or she was 'unavoidably prevented' from discovering evidence do not allow one to claim that evidence was undiscoverable simply because the defense did not undertake efforts to obtain the evidence sooner." *Thornton*, 2013-Ohio-2394 at ¶ 28, citing *State v. Anderson*, 10th Dist. Franklin No. 12AP-133, 2012-Ohio-4733, ¶ 14. As a result, we conclude Stepp has failed to articulate any legitimate reason why his friend, and even himself, was incapable of discovering the evidence within the time allotted by Crim.R. 33, or at any time sooner than 12 years after his conviction.

{¶23} Based on the foregoing, we hold Stepp has failed to demonstrate by clear and convincing evidence that he could not have learned of the existence of the newly-discovered evidence within the 120-day period set forth in Crim.R. 33(B). Accordingly, we find no abuse of discretion in the trial court's decision to deny Stepp's motion for leave.

{¶24} Furthermore, in viewing the prison request form and Detective Hardin's investigation report in the context of the record as a whole, we do not find the "new" evidence disclosed a strong probability that it would change the outcome if a new trial were granted. Rather, we agree with the trial court that the evidence produced by Stepp is inculpatory in nature, and effectively strengthens the state's case against Stepp. That is, the statements from S.S. and R.R. are consistent with the three victims' testimonies at trial,

and corroborate key facts regarding Stepp's criminal behavior. Specifically, S.S. and R.R. both noted that Stepp pretended to be a police officer and took them to remote areas where he forced them to perform oral sex on him. R.R. also indicated that her attacker drove her in a red car to a remote area, which is consistent with the victims' testimonies. Moreover, despite Stepp's claims that the new evidence suggests "the very real probability that someone other than Stepp was committing the sexual assaults," both women identified Stepp as their attacker. Specifically, S.S. implicated Stepp by name, while R.R. stated her attacker's name was Brian and selected Stepp from the photo line-up. Based upon the contents of Stepp's newly-discovered evidence, we find the evidence is not exculpatory in nature, and does not disclose a strong probability that it will change the result if a new trial was granted.

{¶25} Finally, turning to Stepp's argument regarding Detective Hardin's testimony, we are unpersuaded that Stepp has established a claim pursuant to *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173 (1959).

{¶26} "To establish a *Napue* claim, a defendant must show that: (1) the statement was actually false, (2) the statement was material, and (3) the prosecution knew it was false." *State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 38, citing *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998). In cases where the prosecutor knowingly uses perjured testimony, or fails to correct what he subsequently learns was perjury, the falsehood is deemed to be material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at ¶ 38

{¶27} Here, Stepp claims the new evidence proves Detective Hardin possessed documentation of R.R. and S.S.'s claims against Stepp, contrary to what the detective testified at trial. However, even if we assume, for the sake of argument, that Detective Hardin's testimony amounts to perjury, we find Stepp has failed to demonstrate the

testimony was material as defined by *Napue,* as there is no reasonable likelihood that the state's alleged use of the detective's statement could have affected the jury's verdict.

{¶28} As this court previously held, "the evidence of Stepp's guilt was formidable and, arguably, overwhelming. C.T.'s testimony was corroborated by the other victims in the case, as well as the evidence the police found as a result of searching Stepp's residence, which included a red vehicle and a silver badge that matched C.T.'s version of events." *Stepp*, 2008-Ohio-4305 at ¶ 54. C.T.'s testimony was corroborated by two additional victims, H.K. and J.G., who also testified that Stepp attacked them in a similar manner around the same time period. The new evidence Stepp seeks to introduce further implicates Stepp, as S.S. and R.R. described similar attacks around the same time period, and identified Stepp as their attacker.

{¶29} While Stepp argues the new evidence would have affected Detective Hardin's credibility with the jury, it is apparent from the record that a reasonable jury could have convicted Stepp based upon the remaining evidence against him, as the victims detailed their attacks and identified Stepp as the attacker. Thus, even if the jury determined Detective Hardin was not credible, such a determination would not discredit the remaining, overwhelming evidence of Stepp's guilt.

{¶30} Furthermore, we agree with the trial court that in order to determine that the detective's testimony was inconsistent with the prison form and investigation report, the jury would also learn of R.R.'s and S.S.'s allegations against Stepp. Thus, his new evidence would provide the jury with two additional claims that Stepp, while pretending to be a police officer, sexually assaulted a woman who appeared to be a prostitute, which is consistent with and corroborates the testimony of the three other victims. As a result, we do not agree with Stepp that the new evidence creates more than a reasonable likelihood of affecting the judgment of the jury. Rather, as discussed above, the evidence effectively strengthens the

case against Stepp and therefore, is unlikely to change the outcome of Stepp's trial. As a result, Stepp's "newly-discovered evidence" is not material pursuant to *Napue*, and his claim fails*. Widmer* at ¶ 38.

{¶31} In light of the foregoing, we find no error in the trial court's decision to deny Stepp's motion for leave to file a delayed motion for new trial. Accordingly, we overrule Stepp's assignment of error.

{¶32} Judgment affirmed.

S. POWELL and RINGLAND, JJ., concur.