[Cite as *State v. Ward*, 2021-Ohio-4116.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-06-009 |
| | : | O P I N I O N |
| - vs - | | 11/22/2021 |
| | : | |
| CHRISTOPHER WARD, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 19CR12910

David A. Yost, Ohio Attorney General, and Andrea K. Boyd, Assistant Attorney General, for appellee.

The Hobbs Law Office, and H. Steven Hobbs, for appellant.


**PIPER, P.J.**

{¶ 1} Appellant, Christopher Ward, appeals his convictions in the Preble County Court of Common Pleas for multiple counts of sexual battery and gross sexual imposition.

{¶ 2} Ward, a trooper with the Ohio State Highway Patrol, was investigated after multiple women and a minor made allegations against him of sexual misconduct. The minor, a 15-year-old girl, told police that during a sleep-over with Ward's daughter, Ward

touched her pubic area underneath her panties. One woman told police that she was a passenger in a car that Ward pulled over for speeding. After Ward ordered her out of the car, Ward patted the woman down multiple times, using an open hand and cupping the area between the woman's legs and chest area with his hands.

{¶ 3} Ward pulled another woman over for allegedly having a broken brake light on a trailer she was pulling behind her vehicle. Ward entered the woman's vehicle with his pants unzipped. When the woman tried to exit her vehicle, Ward pulled her by her hair closer to him and threatened her. He then slapped her, stepped on her hand, and forced his penis into her mouth. After the sexual assault occurred, Ward photographed the woman with a camera.

{¶ 4} Another woman reported that Ward pulled her over several times, issuing a warning each time rather than a citation. He wrote his telephone number on the last written warning he gave her, and the woman agreed to call him out of hopes that he would stop pulling her over. The two went to dinner and then back to Ward's home where the woman had parked her vehicle. The woman heard Ward answer a telephone call from his daughter and heard that Ward was screaming at his daughter over the phone. He then disappeared for a few moments and then returned wearing his trooper's uniform. He then pinned the woman's arms down and placed his hands down the woman's pants and rubbed her vaginal area underneath her clothing. She was then able to escape.

{¶ 5} Ward was indicted on several counts related to the sexual misconduct. Ward pled not guilty, waived his right to a jury trial, and the matter proceeded to a four-day bench trial. The trial court found Ward guilty of one count of sexual battery and three counts of gross sexual imposition. The trial court sentenced Ward to an aggregate sentence of three years in prison and designated him a Tier III sex offender. Ward now appeals his convictions and sentence, raising the following assignments of error.

{¶ 6} Assignment of Error No. 1:

{¶ 7} THE STATE VIOLATED THE DEFENDANT'S DUE PROCESS RIGHTS IN FAILING TO COMPLY WITH BRADY V. MARYLAND.

{¶ 8} Ward argues the state improperly withheld favorable evidence from the defense in violation of the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Specifically, Ward argues that the state suppressed favorable evidence when it did not produce GPS records that showed the location of Ward's patrol cruiser during the alleged sexual offenses.

{¶ 9} "The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *State v. Johnston*, 39 Ohio St.3d 48 (1988), paragraph four of the syllabus, citing *Brady*. Evidence is material pursuant to *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Johnston* at paragraph five of the syllabus. *Brady* and its progeny apply only to evidence unknown to the defendant at the time of the trial. *State v. Smith*, 12th Dist. Fayette No. CA2015-12-024, 2016-Ohio-5668, ¶ 19-20

{¶ 10} In order to establish a *Brady* violation, a defendant must show that (1) the evidence at issue was favorable to him or her because it was either exculpatory or impeaching; (2) the evidence was suppressed by the state, either willfully or inadvertently; and (3) prejudice ensued. *State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 91, citing *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936 (1999).

{¶ 11} The *Brady* test is stringent and the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial,

does not establish "materiality" in the constitutional sense. *State v. Fulton*, 12th Dist. Clermont No. CA2002-10-085, 2003-Ohio-5432, ¶ 33, citing *United States v. Agurs*, 427 U.S. 97, 109-110, 96 S. Ct. 2392 (1976). Also, a *Brady* violation occurs only where suppressed exculpatory evidence is discovered after trial so that even if the evidence is disclosed during the trial, there is no *Brady* violation. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 40.

{¶ 12} After reviewing the record, we find that the state did not violate *Brady* for multiple reasons. The GPS records in question showed the location of Ward's patrol cruiser at various times. It is undisputed that the documents showing the coordinates were public record and thus available to Ward at any point prior to trial. In fact, Ward asserted in his motion for a new trial that he had made a public records request for records of his GPS coordinates that he now claims were suppressed by the state. *See State v. Stepp*, 12th Dist. Butler No. CA2020-05-062, 2020-Ohio-6901, ¶ 22 (no *Brady* violation where nothing prevented the appellant from filing a public records request for the information alleged to have been suppressed); *State v. Davis*, 5th Dist. Licking No. 2008-CA-16, 2008-Ohio-6841, ¶ 57 (no *Brady* violation where the records were publicly available and appellant could have obtained access to them); and *Matthews v. Ishee,* 486 F.3d 883, 890-91 (6th Cir.2007) (concluding that documents in question were public information so that the government could not have "disclosed" information "readily available to the defense").

{¶ 13} Moreover, the record indicates that the state produced 568 pages of GPS records as part of its supplemental discovery and gave notice of such discovery well in advance to the bench trial. These records showed approximately three months of GPS information regarding Ward while he was on duty. Ward was clearly aware that the state had in its possession GPS information for a specific timeframe and could easily have requested different or additional records to account for other times. Thus, the records were

not known only to the state, and Ward was able to procure additional documents had he wanted such for purposes of trial.

{¶ 14} Nor can Ward demonstrate that the records would have been material within the meaning of *Brady*, as there is no indication that Ward would not have been convicted had he received every record noting his cruiser's location. The record indicates that Ward's location was only recorded via GPS when he reported an incident. During trial, the court heard the following testimony from a staff lieutenant with the Ohio State Highway Patrol's Planning and Research Development Section who works with the Highway Patrol's policy and accreditation, central records, and statistical analysis.

[Q] How does a dispatcher know when to open an incident?

[A] * * * it's usually when the – the Trooper radios the dispatcher.

[Q] So in order to start an incident, the Trooper must radio dispatch?

[A] Yes.

[Q] So if a Trooper doesn't radio dispatch[,] an incident may not be recorded?

[A] It may not be if, if the dispatcher's not getting any information back. * * *.

[Q] Well, let's say a Trooper doesn't want dispatch to know, if they don't tell dispatch that they're stopping somebody, and if they don't run them through LEADS, would dispatch know that they're stopping somebody?

[A] Not – no.

Thus, if Ward did not report an incident during the times the women were assaulted, his cruiser's location would not have been recorded and he would not have been able to prove his physical location in a different area.

{¶ 15} Had Ward believed that his cruiser's location could have proven he was somewhere else during a time he was accused of committing the sexual misconduct, he

could have requested a copy of the record via a public records request. However, he did not do so and there is no indication in the record that the state suppressed any exculpatory documents. Having found no *Brady* violation, Ward's first assignment of error is overruled.

{¶ 16} Assignment of Error No. 2:

{¶ 17} THE DEFENDANT-APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 18} Ward argues in his second assignment of error that his convictions are against the manifest weight of the evidence.

{¶ 19} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Miller*, 12th Dist. Preble No. CA2019-11-010, 2021-Ohio-162, ¶ 13.

{¶ 20} Questions regarding witness credibility and weight of the evidence "are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler App. No. CA2006-04-085, 2007-Ohio-911, ¶ 26. As such, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Ostermeyer*, 12th Dist. Fayette No. CA2021-01-002, 2021-Ohio-3781, ¶ 35.

{¶ 21} Ward was convicted of sexual battery in violation of R.C. 2907.03(A)(6), which provides, "no person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:  The other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person."  Ward was also convicted of gross sexual imposition in violation of R.C. 2907.05(A)(1) and (5), which provide,

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> (1)  The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.
>
> (5)  The ability of the other person to resist or consent or the ability of one of the other persons to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person or of one of the other persons is substantially impaired because of a mental or physical condition or because of advanced age.

{¶ 22} After reviewing the evidence, we find that Ward's convictions were not against the manifest weight of the evidence.  Regarding the first conviction for gross sexual imposition, the state presented testimony from the minor who informed police that Ward had touched her pubic area.  The victim testified that when she was 15 years old, she spent the night at Ward's house with his daughter, with whom she was friends.  At approximately 1:00 a.m., Ward came into his daughter's room where the two girls were lying next to each other in the same bed.  The victim testified that she had seen Ward drinking alcohol earlier in the evening and that she thought he was drunk at the time he spoke to the girls.  After speaking with the girls for approximately an hour, he left the room and the two fell asleep.

{¶ 23} The victim testified that she later awoke when she felt a hand rubbing the bottom of her leg. She turned the opposite direction in the bed and fell back to sleep. However, she awoke again when she felt a hand on her inner thigh. The victim testified that the hand was rubbing her and moving toward her pubic area, and that the hand was larger than a woman's hand and rough. She also testified that she felt the hand underneath her panties touching her pubic hair.

{¶ 24} The victim testified that she nudged Ward's daughter in the back and that Ward's daughter woke up. Although the victim did not tell Ward's daughter what had just occurred, Ward's daughter observed her father on the floor next to the bed and told him that he was not supposed to be in her room. Ward responded that he must have fallen asleep while he was speaking with the girls. However, the victim testified that she and Ward's daughter had seen Ward leave the room earlier in the night.

{¶ 25} The next morning, Ward texted his daughter and asked that she tell the victim that he was "sorry about last night." However, the victim did not tell Ward's daughter what occurred. Instead, she called her sister and told her about the events. The victim's sister informed their mother and the victim's mother told the victim to inform Ward's daughter what occurred on the night in question. After the victim texted Ward's daughter and told her what occurred on the night in question, Ward's daughter told her older sister, and a detective later came to the victim's home to ask her about the events.

{¶ 26} The state then presented testimony from Ward's daughter who also testified that she observed Ward drinking alcohol on the night in question and that he came into her room and talked to her and the victim. Ward's daughter testified that after he left, he closed the door. However, she was later awoken and observed her father laying on the floor of her bedroom. Ward's daughter testified that she told him to get out of her room and that he left.

{¶ 27} Regarding another count of gross sexual imposition, the victim testified that she and her friend were on their way to breakfast when Ward pulled them over for speeding. The victim, who was the passenger in the vehicle, testified that Ward removed her friend from the car and placed her in the back of his cruiser. He then asked the victim to exit the vehicle and consent to a pat down. The victim complied. The victim testified that Ward told her to stand with her arms down at her side and to spread her legs. He then patted down the victim's arms and sides, and then patted down her chest area. The victim testified that Ward paused on her chest area and then continued to pat down her legs, thighs, as well as her vaginal area with an open palm, and that he repeated his pat down three times.

{¶ 28} When asked to more thoroughly explain the way in which Ward patted her down in her vaginal area, the victim testified that Ward cupped his hand, "pressed up against, rubbing inward and his fingers curled a couple of times just pressing up, just feeling overly in-depth in there each time." The victim testified that after Ward patted her down for the last time, he placed her in the back of his cruiser with her friend and that she told her friend that Ward had touched her vagina. Once Ward released the two, they continued to a nearby restaurant where the victim called police and her father. She then filed a complaint with the Ohio State Highway patrol.

{¶ 29} The final gross sexual imposition victim testified that Ward pulled her over multiple times over an extended period of time, each time issuing her a warning. The last time he pulled her over, he issued a written warning and included his name and telephone number on the back of the citation. The victim testified that she called Ward in hopes of stopping his pulling her over. They agreed to a date, and she drove to his house to meet him.

{¶ 30} The victim testified that the two went to dinner and then returned to Ward's house. There, the victim overheard Ward on the telephone with his daughter. She testified

that Ward was yelling and screaming during his telephone conversation and that his face was "blood red." He then disappeared from the victim's view and came back wearing his trooper's uniform.

{¶ 31} Ward moved behind the victim's body and put his arms around her. The victim testified that Ward placed his arms over her arms and then placed his hands down her pants and began rubbing her vaginal area. The victim was able to "twist" out of Ward's arms and leave his house.

{¶ 32} Regarding the sexual battery charge, the victim testified she was returning home after transporting a horse in a trailer when she was pulled over by Ward. Ward told her to shut off her engine, took her driver's license, and told her that he had pulled her over because a light on the trailer was broken. Ward then claimed that the road noise was too loud and went around to the passenger side of the victim's vehicle and entered her truck. When the victim asked Ward to exit her truck, he told her to "shut up" and that she needed to listen to him. Ward then unbuckled the victim's seatbelt, grabbed her hair, and pulled her across the seat. When the victim cried out and told Ward, "no," he again told her to shut up.

{¶ 33} The victim testified that Ward's pants were unzipped and that he exposed his penis. Ward told the victim that he knew where she was from and that he had friends in her location that would "watch over" her. Ward instructed the victim to make him "happy." The victim tried to move, but Ward held her head, pushed it down, and stepped on her hand with his boot. When the victim began crying, Ward yanked her head up by her hair and slapped her in the face. Ward then forced his penis into the victim's mouth. After Ward released the victim, he smiled at her and warned her that he could "do certain things" to keep her "quiet." He then produced a camera and took a photograph of the victim.

{¶ 34} Ward testified in his own defense and claimed that he did not commit any of the charged sexual crimes. On appeal, he further points to minor contradictions in the witnesses' testimony regarding their retelling of the sexual misconduct. However, the inconsistencies, such as at what time of the day the incident occurred, were inconsequential to the overall question of whether the act took place, and instead, were meant to test the credibility of the witnesses. The trial court was in the best position to judge the credibility of the witnesses, and we will not disturb such findings on appeal. Convictions are not against the manifest weight of the evidence simply because the trier of facts believed the state's witnesses over the defense. *State v. Martino*, 12th Dist. Butler No. CA2017-09-139, 2018-Ohio-2882, ¶ 13.

{¶ 35} After reviewing the record and weighing the evidence with all related reasonable inferences, we find that the trial court did not clearly lose its way or create such a manifest miscarriage of justice that Ward's convictions must be reversed and a new trial ordered. As such, his second assignment of error is overruled.

{¶ 36} Judgement affirmed.

HENDRICKSON and BYRNE, JJ., concur.